IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION


PHILIP TUCKER and TONI HOTTEN,          Civ. No. 09-1491-AC

                Plaintiff,                OPINION AND
                                        ORDER

      v.

CASCADE GENERAL, Inc., an Oregon
corporation, and the UNITED STATES OF
AMERICA

                Defendants.

_____

ACOSTA, Magistrate Judge:

*Introduction*

     Plaintiff Philip Tucker ("Tucker") was injured when a detachable portion of the upper deck

of a dredge fell on top of him.  He and his wife, Plaintiff Toni Hotten (collectively "Plaintiffs"),

bring this action against Defendants Cascade General ("Cascade General") and the United States of

America ("the United States") alleging claims of negligence. Plaintiffs and Cascade General both move for summary judgment on the United States' affirmative defense which asserts immunity from suit under the discretionary function exception to the Federal Tort Claims Act ("FTCA"). Where Plaintiffs and Cascade General's positions are fundamentally the same, the court will refer to them collectively as "Movants." For the reasons stated below, the court concludes that the discretionary function exception does not bar Plaintiffs' claims against the United States.

*Factual Background*

Tucker worked on the vessel ESSAYONS at the time of the accident. In the early 1990s, the deck of the ESSAYONS was modified to allow easier access between the upper and lower decks. The modification created an opening in the deck. The opening was closed off with a cover made up of five sections ("the cover sections") such that one to five sections could be removed at a time, depending on the needed size of the opening. (Jarrett Decl., Ex. F at 6.) There was a procedure for removing the cover known to the crew but not reduced to writing. *Id.* at 7. Under this procedure, and after making sure that no crew member was down below, the region around the opening was cordoned off, and two crew members would lift the cover sections and slide them away from the opening to a "safe location." *Id.* at 7-8. The cover sections were secured when the vessel was underway, but were not necessarily secured while in the shipyard to provide easier access to the opening. *Id.* at 9-10.

There was no formal training as to proper procedure for removing the cover, but Ross Cinkowky ("Cinkowsky"), the engineer who designed the opening and cover, observed the crew removing the cover at the time of installation and concluded that it was a safe procedure, and he verbally affirmed it. (Jarrett Decl., Ex. G at 3.) Cinkowsky testified that he once attempted to lift

one of the cover sections himself, found it to be very heavy, and was unsure if he could lift it on his own. *Id.* at 4-5. He explained that hinges were not used in designing the cover because, when open, the cover sections would get in the way of cables and lines that would be pulled across the deck. *Id.* at 5. Cinkowsky explained further: "And so it's just not very practical to have it hinged. And as heavy as it is, with a hinged hatch, you're going to need a counterweight power, something like that, and those kind of mechanisms are a maintenance headache, especially if they're not operated almost daily. It sits for two or three months and gets used, and it won't work." *Id.* at 6. Cinkowsky admitted at deposition that there was potential for the plates to fall through the opening and that he was aware of that danger at the time of installation. *Id.* at 13. He testified that he did not see a need for warning signs at the time of installation, in part because the plates were too heavy for a single person to lift. (Franken Decl., Ex. C at 39, 41-42.)

Prior to the events giving rise to this lawsuit, another ESSAYONS crew member dropped the plate through the opening, without causing injury, however. (Jarrett Decl., Ex. D at 4.) Patrick Sloan testified that the mechanism that kept the plate securely over the opening was typically not bolted down and could be kicked aside. *Id.* at 9. Further, it was not a part of the security protocol to check that the plates were securely bolted down. (Jarrett Decl., Ex. E at 2.) At the time of the incident, the plate covering the deck opening was not bolted down. (Jarrett Decl., Ex. C at 8.)

### Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) (2011). Summary judgment is not proper if material factual issues exist for trial. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324. A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements. *Hernandez v. Spacelabs Medical, Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Thus, summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The court must view the evidence in the light most favorable to the nonmoving party. *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). However, deference to the nonmoving party has limits. The nonmoving party must set forth "specific facts showing a *genuine* issue for trial." FED. R. CIV. P. 56(e) (2008) (emphasis added). The "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Therefore, where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted).

## Discussion

"The FTCA confers subject matter jurisdiction on the federal district courts to hear tort actions against the federal government for negligence of its employees under circumstances in which

the United States, if it were a private party, would be liable under the law of the place where the tortious act or omission occurred." *Whisnant v. United States of America*, 400 F.3d 1177, 1180 (9th Cir. 2005) (citing 28 U.S.C. § 1346(b)(1)). This represents a waiver of the federal government's immunity from suit. *Green v. United States of America*, 630 F.3d 1245, 1249 (9th Cir. 2011). The waiver is not absolute, however, and "the discretionary function exception provides an exception to the waiver of immunity from suit under the FTCA for '[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the exception involved be abused.'" *Id.* (quoting 28 U.S.C. § 2680(a)).

In crafting this exception, Congress intended to "prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Berkovitz v. United States*, 486 U.S. 531, 536-537 (1988). Furthermore, "it is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case. . . . Thus, the basic inquiry concerning the application of the discretionary function exception is whether the challenged acts of a Government employee – whatever his or her rank – are of the nature and quality that Congress intended to shield from tort liability." *United States v. S.A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines)*, 416 U.S. 797, 813 (1984). In other words, to the extent that the conduct of a government actor involved an exercise of discretion, this exercise must have also implicated a policy goal to qualify for the discretionary function exception to the FTCA. *Earles v. United States of America*, 935 F.2d 1028, 1031 (9th Cir. 1991).

To evaluate whether the action qualifies for the discretionary function exception, courts apply a two-part analysis. "First, [the court] must determine whether the challenged actions involve an 'element of judgment or choice.'" *Terbush v. United States of America*, 516 F.3d 1125, 1129 (9th Cir. 2008) (citing *United States v. Gaubert*, 499 U.S. 315, 322 (1991)). The act is not considered discretionary where "a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Berkovitz*, 486 U.S. at 536. If the alleged action is contrary to a specific rule, it cannot be discretionary and cannot benefit from the discretionary function exception.

If the action is determined to be discretionary under the first prong, the court then must determine "whether the challenged action is of the type Congress meant to protect – i.e., whether the action involves a decision susceptible to social, economic, or political policy analysis." *Whisnant*, 400 F.3d at 118 (citing *O'Toole v. United States*, 295 F.3d 1029, 1033-1034 (9th Cir. 2002)). Thus, the action must invoke considerations of public policy in order to be shielded from immunity. *Green*, 630 F.3d at 1249. Finally, "[i]t is the government's function to demonstrate the applicability of the discretionary function exception." *Whisnant*, 400 F.3d at 118 (citing *Bear Medicine v. United States of America*, 241 F.3d 1208, 1213 (9th Cir. 2001)).

I.    First Prong:  Specific Course of Action

The court must first determine whether the actions giving rise to Tucker's claims were controlled by a federal statute, regulation, or policy. At issue here is the U.S. Army Corps of Engineers' Safety and Health Requirements Manual ("the manual"), and the parties disagree on which section of the manual applies to the vessel in question. Movants argue that section 26 of the manual applies and that it explicitly requires hinges to secure coverings over openings in the deck of a vessel. The United States responds that section 26 neither applies to vessels nor does it they

qualify as the kind of regulations that are relevant to the discretionary function exception. The United States further argues that, even if Section 26 does not apply, the language of Section 31 is inconsistent with the terminology used in the maritime context and, therefore, cannot apply to the modification at issue here. Specifically, the United States contends that the opening in question is covered by "deck plates," and the references in the manual to "hatchways" and "hatch covers" are inapposite and cannot be applied to a vessel. Both parties submitted excerpts of the manual in support of their respective positions, but the limited excerpts left unresolved which section was applicable, or if some other section not before the court was actually more relevant. After hearing on this motion, the court directed the parties to produce the complete manual to the court for its review. *See* Court's Exhibit to Motion Hearing 73 (#75) ("Court Ex.").

As of April 1, 1981, a manual entitled "EM 385-1-1" was "approved for use in military construction, alteration, and repair activities[.]" (Court Ex. at 3.) According to the 1987 version of EM 385-1-1, the manual "prescribes the Safety and Health Requirements for all Corps of Engineers activities and operations[,]" and its dictates "are applicable to all missions under the command of the chief of Engineers whether accomplished by military, civilian, or contractor forces." *Id.* Section 26, entitled "Floating Plant and Marine Locations," by its language does appear to set forth operational requirements for vessels. It does not, however, set forth requirements for the type of modification at issue in this case, namely, openings with removable coverings on the deck of a vessel. Thus, if the manual governs modifications of United States vessels, it is not clear that section 26 applies here and, thus, other sections of the manual must be examined.

Section 31, entitled "Floor and Wall Openings," defines floor and wall openings by their dimensions and is primarily concerned with setting forth safety requirements for such openings.

OPINION AND ORDER                                       7                                       {KPR}

Section 31 of the manual defines an opening in a floor or roof as "an opening measuring 12 inches or more in its least dimension" that is "covered and/or guarded primarily to prevent persons from falling through." *Id.* at 4. Section 31 further provides that such coverings "shall be secured in place to prevent accidental removal or displacement." *Id.* Also, the section differentiates floor openings from "hatchway[s] and chute floor opening[s]" which must "be guarded by a hinged floor-opening cover equipped with railings attached so as to leave only one exposed side." *Id.*

With these provisions as context, Movants assert that the United States cannot rely on the discretionary function exception as a matter of law. Thus, as to the first prong of the exception, the court must determine whether, viewing the evidence most favorably to the United States, a reasonable fact-finder could conclude that the underlying actions involved an element of judgment or choice. The United States argues that Section 31 does not apply to openings in ship decks, and it submitted extensive supplementary evidence on this issue, including the testimony of David Stanton, the Corps' Chief of Safety for the Portland District, who testified that Section 26 applies to vessels and Section 31 does not. He also stated that "[t]he EM-385-1-1 Safety Manuals have general application Corps' wide, but the work of the Corps is so varied that not every provision of each Section of the Manuals can apply to each and every aspect of the many missions of the Corps nationally and internationally." (Franken Supp. Decl., Ex. M at 2.) The United States also submitted the affidavit of Mac Robison, the Corps' Chief of Plant Maintenance for the Portland District, who agreed that Section 31 does not apply to vessels, and that other sections of the manual, including Section 26, have limited application to vessels "and in those instances the Section specifically mentioned vessels." (Franken Supp. Decl., Ex. V at 2.) This position is echoed by the testimony of Lawson Bronson, a "maritime liability expert," who testified that he did not think that Section 31

applied to openings in a ship's deck. (Franken Supp. Decl., Ex. O at 47.)

On this first prong, a question of fact exists as to whether a federal statute, regulation, or policy specifically prescribed a course of action for the Corps to follow here. The evidence conflicts over whether a standard governs the design of the cover sections and, if so, what that standard is and what it requires. A reasonable jury could find that the design of the cover sections was not governed by Section 31 and did involve an element of discretion. Viewing the manual in the light most favorable to the United States, it is not clear whether Section 31 or Section 26 applies to vessels and to the cover sections at issue. The language in Section 31 is not of the kind typically used to refer to the structure of a vessel, and the court cannot conclude as a matter of law that the floor openings referred to in Section 31 are the same as or analogous to an opening in a ship's deck. Furthermore, the court cannot conclude on summary judgment that the manual's guidelines supersede the type of judgment exercised by an engineer in designing a modification to a vessel. The section is less than two pages long; it is unclear that its content is sufficient to govern all modifications to the structure of vessels and, even if it purported to do so, that its guidelines would be binding where the sound judgment of the designing engineer counseled otherwise.

Thus, a genuine factual dispute exists as to whether there was a statute, regulation, or policy strictly prescribing the United States' action in this situation. Accordingly, the court must proceed to prong two of the discretionary function exception analysis.

II.    Second Prong – Considerations of Public Policy

The court must next determine, to the extent the United States' actions involved discretion or judgment, whether the actions also implicated considerations of public policy. Movants argue that: (1) although the United States' overarching design of the opening and its cover may be shielded

OPINION AND ORDER                                   9                                        {KPR}

by the discretionary function exception, its implementation and failure to warn of a known danger are not; and (2) that, to the extent the design involved scientific judgment, such judgments are not protected by the discretionary function exception. The United States responds that decisions involving the nation's reserve fleet, of which the ESSAYONS was a member, implicate important national security and emergency response concerns, and are more likely to be shielded as discretionary decisions which implicate considerations of public policy.

The Ninth Circuit, surveying its decisions on the discretionary function exception, identified two trends:

> First, a dominant theme in our case law is the need to distinguish between design and implementation: we have generally held that the *design* of a course of governmental action is shielded by the discretionary function exception, whereas the *implementation* of that course of action is not. Second, and relatedly, matters of scientific judgment – particularly judgments concerning safety – are rarely considered to be susceptible to social, economic, or political policy.

*Whisnant*, 400 F.3d at 1181. The first trend counsels that, where the government exercises its discretion in designing a course of action, it may not exercise discretion in its implementation and must adhere to its chosen course. The second trend counsels that objective safety determinations involving matters of scientific judgment are generally not shielded by discretionary function immunity.

A.    *Implementation*

Plaintiffs argue that the United States was negligent in implementation of its chosen design of the opening and cover: that it failed to ensure that the plates were bolted down; to adequately train the crew in removal of the plates; and to warn of a known danger. These allegations fall into two categories:  failure to implement safety measures and failure to warn of known dangers.

Movants argue that the discretionary function defense, as a matter of law in this case, is not available to the United States for failing to both implement and to warn, and they seek summary judgment on this separate ground that the defense is unavailable as a matter of law.

     1.     Failure to Implement

     Failure to implement safety measures is generally not considered to be within governmental discretion. *See Myers v. United States of America*, No. 09-65092, 2011 U.S. App. LEXIS 14506, at *28 (9th Cir. July, 15, 2011) ("Thus, while the Navy contends that its determinations about how much safety oversight was required were susceptible to policy considerations, those determinations properly fell within the scope of professional judgments about implementation of the safety plan that were *not* susceptible to public policy considerations."). The government's obligation extends beyond "a general statutory obligation to promote safety," and implicates the need to "'effectuate policy choices already made'" in an appropriate manner. *Id.* (quoting *Bear Medicine*, 241 F.3d at 1215).

     That said, the existence of a hazard does not automatically avoid application of the discretionary function exception. The court in *Terbush* acknowledged that managing hazards may involve governmental discretion: "The district court correctly observed that 'the more fundamental defect with Plaintiffs' argument is that the decision cannot be boiled down to a simple recognition of the existence of some hazard. The entire process, including identifying hazards, determining which hazards require a warning, and determining how and when and where the warning should proceed, involves discretion.'" 516 F.3d at 1137 (quoting the lower court). But, where the government has exercised its discretionary function and "undertaken responsibility for the safety of a project, the execution of that responsibility is not subject to the discretionary function exception. The decision to adopt safety precautions may be based in policy considerations, but the

OPINION AND ORDER         11         {KPR}

implementation of those precautions is not." *Bear Medicine*, 241 F.3d at 1215.

In *Whisnant*, the plaintiff worked in a commissary operated by a federal agency and was exposed to an accumulation of toxic mold, resulting in serious harm to his health. The court concluded that, where the government has adopted safety measures, it cannot avoid liability where it fails to adhere to those safety measures. "Because removing an obvious health hazard is a matter of safety and not policy, the government's alleged failure to control the accumulation of toxic mold in the Bangor commissary cannot be protected under the discretionary function exception." *Id.* at 1183. The court distinguished the "allocation of limited resources among safety-promoting tasks" from a mundane task like mold removal, which the failure to perform "at best, reflects exactly the type of budget-driven shirking of safe maintenance to which the *ARA Leisure-O'Toole* line of cases emphatically denies protection under the discretionary function exception, and at worst constitutes simple carelessness." *Id.* at 1184.

In *Bolt v. United States of America*, 509 F.3d 1028, (9th Cir. 2007), a resident of a United States Army base slipped on snow and ice that had not been removed pursuant to the Army's maintenance schedule. On the first prong of the discretionary function analysis, the court found that the Army's policy to remove snow and ice once per year in February or March constituted a specific and mandatory regulation, but on the second prong, the court concluded that the Army failed to adhere to its own policy, and so the discretionary function exception was unavailable. The court went on to state that, even if it had not determined that the Army violated a specific regulation, "[it] would nonetheless conclude that such discretion 'is [not] the type of decision-making that the discretionary function [exception] was designed to protect.'" *Id.* at 1033 (quoting *Conrad v. United States*, 447 F.3d 760, 765 (9th Cir. 2006)). The court rejected the proffered policy justifications for

failing to remove ice and snow as scheduled, noting that the performance of routine maintenance was not a discretionary function and did not trigger the exception. *Id.* at 1034. The court then highlighted the particularly non-discretionary nature of safety measures: "Not only does clearing snow and ice from parking lots constitute a matter of routine maintenance beyond the scope of the discretionary function exception, but the maintenance at issue here 'involves safety considerations under an established policy' rather than 'the balancing of competing public policy considerations.'" *Id.* The court concluded that the Army's failure to adhere to its own safety measures "render[ed] inapplicable any public policy consideration to which the Army might now point." *Id.* The Ninth Circuit recently underscored the point that questions of safety, particularly those subject to scientific or other professional judgment, "'are rarely considered to be susceptible to social, economic, or political policy.'" *Myers*, 2011 U.S. App. LEXIS 14506, at *28 (quoting *Whisnant*, 400 F.3d at 1181).

The material circumstances here are similar to those the Ninth Circuit found determinative in *Bolt*. The United States submitted deposition testimony of Lindsey Docherty ("Docherty"), Cascade's Chief of Safety, regarding the procedure for removing the deck plates. According to Docherty, the deck plates were originally removed by the crew of the ESSAYONS, but were later removed by Cascade personnel. He stated that removal was a two-person operation, did not involve supportive machinery, but was accomplished solely through "manpower," and required that the area down below was cleared prior to removal of the plate. (Franken Supp. Decl., Ex. P.) Docherty's testimony reveals that the ESSAYONS crew was initially responsible for removing the plates, though Cascade personnel were later permitted to remove deck plates themselves. This testimony may speak to the substance of the dispute between Cascade and the United States regarding who was

OPINION AND ORDER                              13                                    {KPR}

responsible for the events leading up to Tucker's injury. It does not, however, address whether a failure to train personnel as to proper removal of the deck plates is shielded from liability by the discretionary function exception.

Here, the United States designed the modification to the deck of the ESSAYONS and promulgated a safety manual which purports to set forth the safety requirements for all Corps operations. Having set forth a framework governing the safety of the operation of vessels such as the ESSAYONS, the United States is responsible for implementation of the its safety policies. Thus, to the extent that the United States failed to implement its own safety measures, it may not invoke the discretionary function exception. In particular, the United States allegedly permitted the kick plates to remain unbolted while the dredge was moored, and it failed to train the crew in proper removal of the cover. In sum, Plaintiffs allege that the United States was negligent in implementing its own design and safety measures and, if proven, such failures are not barred by the discretionary function exception.

2.    Failure to Warn

Courts have held consistently that the discretionary function exception rarely insulates the United States from a claim alleging the failure to warn of a known hazard. The Ninth Circuit has, with very limited exception, placed such failure outside the realm of policy and, accordingly, the discretionary function exception. It wrote:

> [A] failure to warn involves considerations of safety, not public policy. It would be wrong to apply the discretionary function exception in a case where a low-level government employee made a judgment not to post a warning sign, or to erect a guardrail, or to make a safer path. Such a judgment would be no different than a judgment made by a private individual not to take certain measures to ensure the safety of visitors. . . . Therefore, in cases where the government has allegedly failed to warn, the use of the discretionary function exception must be limited to those

OPINION AND ORDER    14    {KPR}

> unusual situations where the government was required to engage in broad, policy-making activities or to consider unique social, economic, and political circumstances in the course of making judgments related to safety.

*Faber v. United States*, 56 F.3d 1122, 1125 (9th Cir. 1995). The *Faber* court cited *Lesoeur v. United States*, 21 F.3d 965 (9th Cir. 1994), as one such instance where the failure to warn was within the exception. In *Lesoeur*, the United States' decision not to warn of the dangers involved in guided river tours operated by the Hualapai Indian Tribe was based on its policy decision "to refrain from asserting regulatory authority over the Tribe's tours due to the Tribe's claims of sovereignty." *Id.* at 967, 970. The United States was entitled to immunity from suit because its decision to recognize the Tribe's sovereignty was the result of balancing competing policy objectives, which process is shielded from liability by the discretionary function exception.

The discretionary function exception also may apply to a failure to warn where the United States was called upon to balance safety considerations that were genuinely competitive, implicating a meaningful policy analysis. *Bailey v. United States*, 623 F.3d 855, 862 (9th Cir. 2010) (citing *Miller v. United States*, 163 F.3d 591, 596 (9th Cir. 1998)). In *Bailey*, the Army Corps of Engineers was sued after a boater went over a dam and drowned. The warning signs that were usually in place to warn boaters of the dam's location had recently washed away in exceptionally high waters. Only days before, "the Corps had attempted to replace the signs," but had determined that conditions were "so turbulent as to threaten the safety of its workers who had to ford the river to attach new signs and buoys." *Id.* at 858. The court noted the general rule that a failure to warn is not shielded from liability by the discretionary function exception. It concluded, however, that "although the Corps was implementing a safety program when it was deciding when to replace the washed-out signs, in doing so it had to balance competing policy interests . . . ." *Id.* at 862. As such, the Corps was

OPINION AND ORDER                    15                         {KPR}

immune from suit.

In the present case, Plaintiffs allege a failure to warn of the known danger of the cover falling through the opening in the deck into the area below. In fact, the cover fell below deck on at least one occasion before the accident that injured Tucker. The United States has presented no evidence or convincing argument that the decision not to place warning signs or mandate training was the result of a broad policy objective of the federal government, or somehow outweighed by another social, economic, or political consideration. Rather, the United States argues only that it exercises broad discretion over matters of defense and that its reserve fleet, the ESSAYONS included, is crucial to the national defense. The United States' argument that warning against leaving a deck cover on a dry-docked vessel unsecured or failing to train personnel to properly secure such covers carries national defense implications is a tenuous justification at best; in reality, this is not level of policy decision that is shielded from liability by the discretionary function exception.

The Third Circuit addressed this persuasively in *Gotha v. United States of America*, 115 F.3d 176, (1997).[1] In *Gotha*, the plaintiff alleged a claim of negligence arising from the United States Navy's ("the Navy") failure to provide a handrail and adequate lighting on a steep pathway on the naval base. The Navy asserted that the decision not to construct a stairway or install lighting was the result of "'military, social and economic considerations . . . .'" *Id*. at 181 (quoting a Navy affidavit). Specifically, the Navy's asserted considerations included "'a policy of insuring that the

---

[1] The Ninth Circuit has previously cited *Gotha* for "rejecting government's argument that national security concerns were implicated in a decision of whether to install a staircase or bar passage down an embankment on a naval base." *Terbush*, 516 F.3d at 1130. It has also cited *Gotha* for the proposition that the discretionary function exception too broadly construed "'could almost completely nullify the goal of the [FTCA].'" *O'Toole v. United States*, 295 F.3d 1029, 1037 (9th Cir. 2002) (quoting *Gotha*, 115 F.3d at 179).

OPINION AND ORDER                          16                          {KPR}

United States Navy and allied forces can safely train with weapons in a realistic warfare environment[,]'" and concerns that construction could damage nearby weapons systems, compromise the safety of personnel, and interfere with budgetary constraints. *Id.* The Third Circuit drew a distinction between activities like the construction weapons systems and those as basic as the construction of a stairway and wrote: "This case is not about a national security concern, but rather a mundane, administrative, garden-variety, housekeeping problem that is about as far removed from the policies applicable to the Navy's mission as it is possible to get." *Id.* The Third Circuit's reasoning applies here. The United States' failure to adequately warn of the known danger that the cover sections could fall through to the lower deck does not implicate the larger national security interests the discretionary function exception is designed to shield from liability.

In its supplemental briefing, the United States submitted evidence that warnings were not needed with respect to the deck plates and their removal. A report prepared by authored by Bronson, on behalf of Bronson Marine, states in the "Opinions" section that "[t]he purpose and use of the deck plate is obvious so there is no[] need for danger or warning labels." (Franken Supp. Decl., Ex. N at 3.) At deposition, Bronson agreed with the proposition that "there was no need for ESSAYONS personnel to warn Cascade General personnel about the weight of the deck plate, [as] the sections were manufactured and installed by Cascade General[.]" (Franken Supp. Decl., Ex. O at 14.) This evidence, however, goes to the question of negligence itself, not to whether the discretionary function exception is available where the United States fails to adequately warn of a known danger. If the United States was not negligent in not providing warnings about the dangers associated with removal of the deck plates, the availability of the discretionary function exception is irrelevant.

Accordingly, the United States is not shielded from liability by the discretionary function

exception regarding the negligent failure to warn allegation.

*Conclusion*

Consistent with the above disposition, Plaintiffs motion (#46) and Cascade's motion (#48)

for partial summary judgment are GRANTED.

IT IS SO ORDERED.

DATED this 17th day of October, 2011.

JOHN V. ACOSTA
United States Magistrate Judge