IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

PHILIP TUCKER,

                Plaintiffs,

      v.

CASCADE GENERAL, INC., an Oregon
corporation, and UNITED STATES OF
AMERICA,

                Defendant.

3:09-cv-1491-AC

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

ACOSTA, Magistrate Judge

      Philip Tucker ("Tucker") brings this negligence action against Cascade General, Inc.

("Cascade") and the United States to recover damages for personal injury to Tucker.[1] Tucker

sustained permanent and life-altering injuries aboard the Dredge ESSAYONS, a public vessel

---

[1] At one time, Tucker and his wife, Toni Hotten, were plaintiffs in this case. Hotten
brought a claim for loss of consortium against Cascade General, Inc. ("Cascade"), and the
United States. Hotten settled her claim with Cascade and dismissed her claim against the United
States.

owned by the United States, when a hatch cover from the upper pump room fell through the hatch opening and struck him in the head while he was working below in the lower pump room.

The United States and Cascade filed cross-claims against each other. Prior to trial, Tucker settled his claim against Cascade; and Cascade's cross-claims against the United States were dismissed, with prejudice. The court defers ruling on the United States' contractual cross-claims against Cascade.

A nine-day court trial of Tucker's case against the United States commenced on April 28, 2014, and concluded on May 23, 2014.[2] On June 18, 2014, the court heard closing summations, and the parties' final submissions were filed on August 22, 2014. On August 25, 2014, the United States filed an Objection and Motion to Strike References in Plaintiff's Proposed Findings of Fact to Excluded Exhibits. Thereafter, the court took this case under advisement.

After careful consideration of the facts and evidence presented by the parties at trial through live and video witnesses, deposition testimony, and exhibits, and having had the opportunity to assess the demeanor of the witnesses, and review and weigh the evidence, the court makes the following findings of fact, which the court finds and holds were established by a preponderance of the evidence, and conclusions of law, pursuant to Rule 52(a)(1) of the Federal Rules of Civil Procedure. Moreover, to the extent any finding of fact constitutes a conclusion of law, the court adopts it as such and, to the extent any conclusion of law constitutes a finding of fact, the court adopts it as such.

---

[2]The trial was in recess between May 2 and May 18.

## PRELIMINARY MATTERS

After the parties filed their respective Proposed Findings of Fact and Conclusions of Law, the United States filed an Objection and Motion to Strike References in Plaintiff's Proposed Findings of Fact to Excluded Exhibits (doc. # 351). The United States moves to strike references and related argument in Tucker's proposed post-trial findings concerning photographs excluded prior to trial and not admitted into evidence.

Tucker has voluntarily withdrawn the challenged exhibits and related argument. In addition, the court neither considered, nor relied upon the objected exhibits in reaching its decision below. Accordingly, that portion of the United States' Motion is DENIED, as moot.

Additionally, the United States renews its request to have certain transcribed testimony and videos assigned exhibit numbers and admitted as part of the trial record. Tucker has no objection. The portion of the government's Motion that requests the following evidence be admitted is GRANTED:

| | |
|---|---|
| Exhibit 603: | Stevens Transcript; |
| Exhibit 604: | Dyer Transcript; |
| Exhibit 605(a): | Wolff Transcript; |
| Exhibit 605(b): | Wolff Video; |
| Exhibit 606(a): | Tucker Transcript; |
| Exhibit. 606(b): | Tucker Video; |
| Exhibit 607: | Dr. Hamburg Video. |

## STIPULATIONS

The Revised Joint Pretrial Order (doc. #235) contains the following joint stipulations:

1. At times material hereto, Tucker has been a resident of Clark County, Washington.

Page 3 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

2.     At times material hereto, the Department of the Army, Army Corps of Engineers ("Corps"), which is a department of the United States of America, had offices in Portland, Multnomah County, Oregon, and within this District.

3.     The Dredge ESSAYONS ("Dredge" or "ESSAYONS") is a public vessel of the United States, which was operated by the Corps and was located in this District when suit was filed.

4.     At times material hereto, the United States entered into two contracts with Cascade to perform maintenance and repairs on the Dredge at its Portland, Oregon facility.  Under one of those contracts, Cascade was required to clean in the Dredge's lower pump room.

5.     Tucker was an employee of West Coast Marine Cleaning ("West Coast"), which, *inter alia,* cleaned tanks and bilges on vessels such as the Dredge.

6.     Cascade hired West Coast to clean areas of the Dredge for the Corps.

7.     On September 26, 2008, Tucker and other West Coast workers were onboard the Dredge at Cascade's Portland shipyard to accomplish this work.

8.     While Tucker was working in the lower pump room on the Dredge, one of Cascade's employees, Joshua Economides, attempted to lift one end of a hatch cover or deck plate (the parties disagree on the proper terminology for this object)[3] that was located in the upper pump room on the Dredge.  Economides was unable to hold the cover, and it dropped to the lower pump room where Tucker was working, injuring him.

9.     As a result of his injuries, Tucker incurred medical expenses and lost income.  The parties do not agree on the amount, extent, or nature of his damages, but Cascade and the United States have not disputed that Tucker sustained injuries in the accident on the Dredge.

---

[3]Based upon the evidence at trial, the court concludes the term "hatch cover" is the appropriate term.

# FINDINGS OF FACT

I.    Background

1.    Tucker was born on February 15, 1975, and was thirty-three years old on September 26, 2008, the date of the accident. Tucker is married to Toni Hotten, who was previously dismissed from the lawsuit. The couple has a daughter, Chelsea, age 13.

2.    In 2008, Cascade owned and operated a shipyard on the Columbia River at Swan Island, Portland, Oregon. Cascade employs eight trades or crafts of shipyard repair workers, and between 200 and 600 Cascade shipyard repair workers work on any given day. (Derek Bristow Trial Tr. 1536:6-15, May 22, 2014; William John Kelley Trial Tr. 534:6-10, April 22, 2014; Def.'s Trial Ex. 546.)

II.   The Hatch Cover

3.    The Dredge has four primary decks. (Def.'s Trial Ex. 503 at 3; Def.'s Trial Ex. 505 at 3; (Trial Tr. Clement 715: 5-25.) The forward portion of the vessel contains the Dredge's pump room, a three-deck high room connected vertically by a central opening. (Def.'s Trial Ex. 503 at 3; Def.'s Trial Ex. 504.) The lower pump room, situated on the lower deck, houses most all of the dredging pumps, piping, and related equipment, and provides access to the bilge tanks. (Def.'s Trial Ex. 503 at 3; Def.'s Trial Ex. 504; Pl.'s Trial Ex. 317H.) The second level, identified as the main deck on vessel drawings, consists primarily of the large central opening surrounded by a perimeter catwalk.[4] (Pl.'s Trial Ex. 317F; Pl.'s Trail Ex. 317G.) The third level of the pump room, located on the upper deck, was called the upper pump room. (Def.'s Trial Ex. 503 at 1, 3; Def.'s Trial Ex. 504.) The top deck above the pump room was the poop deck or

---

[4]At trial, witnesses occasionally referred to the main deck as the "tween deck."

weather deck.[5]  People travel from one level to the next using an incline-ladder staircase situated approximately forty feet forward of the pump room.  (Def.'s Trial Ex. 503 at 3; Def.'s Trial Ex. 504; Patrick Sloan Trial Tr. 812:15-22, May 1, 2014.)

4.      In 1991, the Corps opted to modify the cover for the opening or hatchway in the deck of the ESSAYONS's upper pump room.  (Def.'s Trial Ex. 505 at 1, 2.)  The opening in the upper pump room deck was large enough to permit dredging equipment to move between the three decks comprising the pump room.  Most of the time, the opening was covered with a removable gripstrut grating bolted to the deck with a central walkway.  (Stephen R. Cinkosky Trial Tr. 330: 13-15; 337: 13-18, April 29, 2014.)  The Corps assigned its mechanical engineer, Stephen R. Cinkosky, the task of designing a stauncher new cover for the opening that was less cumbersome to remove.  (Cinkosky Trial Tr. 317:8-10; 335:17-336:6; 337:2-23.)

5.      Cinkosky's design was acceptable with respect to American Bureau of Shipping ("ABS") class rules and U.S. Coast Guard regulations.  (Christopher Todd Clement Trial Tr. 734:22- 735:7, May 1, 2014.)

6.      The Corps' personnel looked for guidance on safety issues for activities such as the modification project in the Corps' safety manual titled Safety and Health Requirements Manual ("Safety Manual"), commonly known as EM 385-1-1.  (Pl.'s Trial Ex. 414; Jeffery McDonald Trial Tr. 77: 6-16, April 28, 2014.)  The Corps' Safety Manual in effect in 1991, was published in October 1987.  (Pl.'s Trial Ex. 414 at 1.)  The Safety Manual states:

> 1.  Purpose. This manual prescribes the Safety and Health Requirements for all Corps of Engineers activities and operations.

---

[5]At trial, some witnesses referred to the top deck as the "main deck."

2.   Applications. These requirements are applicable to all missions under the command of the Chief of Engineers whether accomplished by military, civilian, or contractor forces.

(Pl.'s Trial Ex. 312 at 1; Pl.'s Trial Ex. 414 at 3.)  Section 31 of the Safety Manual is titled

"Floor and Wall Holes and Openings."  (Pl.'s Trial Ex. 414 at 152; Cinkosky Trial Tr. 366:12-

18.)  It sets forth the following provisions:

> 31.A.02 All floor and roof holes, skylights, and openings into which persons can accidentally walk shall be guarded by an inclosure guard or covered with material and bracing of sufficient strength to support any load which may be imposed. *Coverings for floor and roof opening shall be secured in place to prevent accidental removal or displacement.*
> . . . .
>
> 31.A.05  Every hatchway and chute floor opening shall be guarded by a hinged floor-opening cover . . . .

(Pl.'s Trial Ex. 414 at 152 (emphasis added).)  Section 10 of the Safety Manual is titled "Signals,

Warning Signs, and Signaling."  (Pl.'s Trial Ex. 414 at 51.)  It sets forth the following provisions

regarding safety warnings:

> 10.C.01  Warning signs shall be placed and provide adequate warning of hazards to workers and the public. Signs should be removed or covered when the hazards no longer exist.

(Pl.'s Trial Ex. 414 at 34.)

7.    If the Corps' personnel sought to deviate from Safety Manual provisions, exemptions

required approval by the Offices of the Commanding General.  (Pl.'s Trial Ex. 312 at 1; Pl.'s

Trial Ex. 414 at 3.)  The noncompliant alternative must provide "protection equal to or greater

than the intent of the pertinent provisions" of the Safety Manual.  (Pl.'s Trial Ex. 312 at 1; Pl.'s

Trial Ex. 414 at 3.)  All such waivers had to be documented by submitting a waiver for approval

from the Offices of the Commanding General.  (Pl.'s Trial Ex. 312 at 1; Pl.'s Trial Ex. 414 at

33.)  The design for the new hatch cover was never submitted to the Offices of the Commanding

Page 7 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

General. (Cinkosky Trial Tr. 410:8-14.) Although the Corps' usual practice was to submit similar drawings for its dredges to the United States Coast Guard ("USCG") for approval, the design drawings for the hatch cover were not submitted to the USCG. (Cinkosky Trial Tr. 607:21-608:8; 609:1-6; Def.'s Trial Ex. 505 at 1, 2.) Nor did naval architects or other outside consultants review the new design. (Cinkosky Trial Tr. 612:15-17.) As pointed out by Lawson Bronson, the United States' liability expert, one purpose of the design review process is to identify and eliminate potential hazards. (Lawson Bronson Trial Tr. 1648-1649, May 22, 2014.)

8.    Cascade fabricated the hatch cover and related equipment, and installed them aboard the Dredge at its Portland shipyard. As a result of its fabrication and installation of the equipment, Cascade was aware of the specifications of the hatch cover and related appurtenances, including the size, dimensions, and depth of the supporting lips upon which the hatch cover rested. (Douglas Wolff Video Dep. Tr. 60:23-61:7, 62:4-65:1, March 12, 2014; Bristow Trial Tr. 1526:16-1527:12.)

9.    The new hatch cover arrangement in the upper pump room consisted of five heavy marine grade aluminum panels that were each three feet wide and six feet, four inches long. (Def.'s Trial Ex. 505 at 1, Pl.'s Trial Ex. 317E.) Each of the five panels was capped with diamond plate aluminum. (Pl.'s Trial Ex. 317A; Clement Trial Tr. 4-7.) As a result, the panels appear quite light when they are in fact much heavier. (John Sullivan Trial Tr. 134:6-135:2, April 28, 2014; Bristow Trial Tr. 1537:6-9; Clement Trial Tr. 686:4-6, 722:4-10.) Each panel is approximately three inches thick and weighs over 160 pounds. (Sloan Trial Tr. 801:14-16; Larry Graves Trial Tr. 24:5-13, April 28, 2014; McDonald Trial Tr. 73:3-4.) The panels rest on a two

and one-half inch wide lip or flange[6] that lies just below the deck level and forms a frame around the perimeter of the fifteen foot by six foot, four inch opening; when in place in the closed position, the panels are flush with the surrounding deck of upper pump room. (Pl.'s Trial Ex. 317A; Graves Trial Tr. 24:14-19; Clement Trial Tr. 708:17-21.) When the hatch cover is closed, the width of the supporting flange underneath the panels cannot be determined when viewed from above. (Bronson Trial Tr. 1644:6-10; Lindsay Docherty Trial Tr. 221:12-15, 222:1-5, April 28, 2014.) The forward- and aft-most panels are supported on three sides by the flange, while the three middle panels are supported underneath only the two shorter sides. (Trial Tr. Bristow 1533:1-8; Kelley Trial Tr. 503:10-11.)

10.    In each corner of each rectangular panel there are handholds in the form of round grip bars in recessed holes; the handholds suggest to workers they can move the panels without rigging the panels to a crane or come-along. (Pl.'s Trial Ex. 317C; McDonald Trial Tr. 74:11-19; Sullivan Trial Tr. 124:23-125:13; Michael Medcalf Trial Tr. 1517:23-1518:11, May 22, 2014.)

11.    Sliding "keeper plates" slide over the edges of and secure each of the five panels of the hatch cover at the two shorter (three-foot-long) ends that face port and starboard. (Cinkosky Trial Tr. 338:3-7.) At the time of the accident, the keeper plates were painted the same color red as the surrounding deck. (Docherty Trial Tr. 198: 11-15.) The panels of the hatch cover cannot be lifted when the keeper plates are bolted in the closed position. (Edwin Anderson Trial Tr. 53:20-23, April 28, 2014.) Once slid closed, each keeper plate can be locked down with three

---

[6]Witnesses at trial used the terms "lip" and "flange" interchangeably. (Clement Trial Tr. 685:18-21.)

bolts. (Cinkosky Trial Tr. 338:8-19, 339:2-24.) Similarly, to move a hatch cover, the operator first loosens the three bolts, then slides the keeper plates back a few inches from over the hatch cover. (Cinkosky Trial Tr. 338:8-19, 339:2-24.) The designer intended the keeper plates closed while underway to prevent vessel movement from shock-bouncing them out of position. (Cinkosky Trial Tr. 340:14-17; Anderson Trial Tr. 45:5-9.) The Corps also encouraged the ESSAYONS's crew to lock down the keeper plates at all times when the vessel was in port. (Cinkosky Trial Tr. 340:18-20.) Nevertheless, when Cinkosky visited the vessel in port he observed the keeper plates were more often in the open positions; Cinkosky would close the keeper plates when he saw they were left open. (Cinkosky Trial Tr. 604:2-9, 605:24-25.)

III.    Operation of the Hatch Cover

12.    The hatch cover arrangement is unusual for the marine industry. (Bronson Trial Tr. 1608:9-1609:6; Kelley Trial Tr. 502:4-8, 517: 3-7.) Normally, a hatch cover cannot fall through the opening on which it rests regardless of the direction the hatch cover is moved. (Kelley Trial Tr. 502:10-19, 510:19-511:9; Clement Trial Tr. 655:12-20, 687:6-8.)

13.    Cinkosky was aware that opening the hatch cover improperly could be "disastrous." (Cinkosky Trial Tr. 345:11-12; 593:4-10.) If an individual lifted and pulled one of the narrow ends of the rectangular panels to starboard or port (toward the keeper plates), instead of pulling the wide end forward or aft onto the adjacent panel, the panel would fall through to the below decks. (Cinkosky Trial Tr. 344:20-345:13; Clement Trial Tr. 685:5-9; Kelley Trial Tr. 503:15-17.) Bronson conceded the hatch cover presented a hazard if pulled to the side, instead of forward or aft toward the abutting panel. (Bronson Trial Tr. 1604:5-1605:15.) Because the supporting flanges were underneath, the fall hazard was hidden to anyone unfamiliar with the nonstandard hatch cover arrangement. (Clement Trial Tr. 685:18-21.)

Page 10 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

14.    The vessel crew treated opening the hatch cover as a two-man job, although one person could do it with a rope in an emergency. (Cinkosky Trial Tr. 342:4-17; Sloan Trial Tr. 798:8-10.) The ESSAYONS's chief mate, Jeffrey McDonald, was in charge of the vessel's deck crew. (McDonald Trial Tr. 68:15-18.) Chief Mate McDonald knew that if one person tried to lift one of the panels of the upper pump room hatch cover improperly - by lifting the panel with a handhold and pulling a short end to port or starboard - the panel would slip off the narrow flange and fall to the below decks. (McDonald Trial Tr. 71:10-20.)

15.    Derek Bristow had thirty-five years of experience at Cascade as a rigger and he had been a supervisor in the rigging craft since 1988. (Bristow Trial Tr. 1524:8-12, 1526:16-18, 1536:16-17.) Riggers specialize in moving heavy vessel gear and equipment, such as hatch covers, on and off ships and from one place aboard a ship to another. (Bristow Trial Tr. 1526:11-14, 1535:14-1536:5.) Among the Cascade crafts, riggers were uniquely qualified to remove the upper pump room hatch cover. (Bristow Trial Tr. 1536:21-1537:5.) In fact, the rigging craft assisted with the installation of the upper pump room hatch cover in 1991, so Bristow knew how it was installed. (Bristow Trial Tr. 1526:23-1527: 12, 1532:15-23.)

16.    In his thirty-five years of experience as a rigger, the ESSAYONS's upper pump room was the only hatch cover Bristow encountered where the cover itself could fall through the hatchway it was designed to close and protect. (Bristow Trial Tr. 1540:9-1542:1.) Due to the two narrow lips that supported the hatch cover panels, there was very little margin for error to prevent the panels from falling through the opening. (Bristow Trial Tr. 1538:17-25, 1533:1-8.) The hatch cover panels were awkward and heavier than they appeared because the heavier under panels were capped by a diamond plate aluminum. (Bristow Trial Tr. 1532:19-24, 1537:6-9.)

17.    John Sullivan, Cascade's carpentry craft head, testified that over his twenty-three year career of working aboard vessels in shipyards he never encountered a hatch cover like the one in the upper pump room of the ESSAYONS. (Sullivan Trial Tr. 101:16-23, 107:2-5.)   The hatch cover was unique because the flange that supported the panels was part of the deck frame. (Sullivan Trial Tr. 101:24-105:11.)   Normally, the flange is part of the hatch cover itself and it extends over the deck or combing for support.   (Sullivan Trial Tr. 101:24-105:11.)   With the hatch cover design regularly encountered by shipyard repairmen, as one side is lifted, the flange on the opposite side pivots on top of the deck – thus, the hatch cover can be raised nearly ninety degrees without risk of the opposite, pivot side falling through the hatchway.   (Sullivan Trial Tr. 101:24-105:11.)   On the other hand, when one of the panels of the upper pump room hatch cover on the Dredge was lifted from one side, the opposite side of the panel pivoted on the narrow flange.   (Sullivan Trial Tr. 101:24-105:11.)   If the panel was lifted too high, or lifted to the side, the panel quickly fell off the opposite narrow supporting flange.   (Sullivan Trial Tr. 101:24-105:11.)   Nor had Sullivan ever encountered a hatch with retractable keeper plates that were not part of the hatch cover.   (Sullivan Trial Tr. 136:17-138:2.)

18.    Christopher Clement, a naval architect and marine engineer, testified about the ESSAYONS's hatch cover:

> A.     Yes.  That's correct.  It's a hazard when they drop.  And that hazard -- unfortunately, when the covers are in place, that -- that hazard is -- is invisible.  It's not visible to anybody from standing there looking at them. And the other problem with it is, as we know now, these covers are quite heavy, but in -- in the marine business, it -- it would be apparent to anybody that was familiar at all with ships that the top material was aluminum and not steel.  And the reason you would know that is because it was not painted.  And, traditionally, aluminum is very difficult to paint and have a cover stay on it because of the oxidation film on it. So from the surface, it looked like a -- it looked like a deck plate made out of aluminum, which was one-third steel and was fairly light.

. . . .

> Q.    Okay.  How do you design hatch covers so they are safe for those who
> want to use them -- have to use them?
>
> A.    Well, every hatch cover that I have seen or designed in my 40-year career
> is designed so that it can't fall through the opening that it's protecting.

(Clement Trial Tr.  685:18-686:6, 687:4-8; *see also* Wolff Video Dep.  14:17-15:5 ('So I think

they were very deceptive in terms of their weight and the way they were not fastened down.").)

Wolff testified the hatch cover arrangement did not comply with the Corps' Safety Manual

standards requiring hinges (Section 31.A.05) and was unsafe to operate.  (Wolff Video Tr.

13:15-25, 15:6-16, 96:9-22.)  Wolff offered a simple modification that would prevent this type of

accident; install vertical pins at the port and starboard end of each panel with corresponding

holes in the supporting lips so that the panels could be lifted only by two people holding it, one

at each end. (Wolff Video Tr. 17:17-18: 9.)

19.    William Kelley, a naval architect and marine engineer, testified:

> Q.    So can you explain to the Court, given your opinion that their training and
> supervision was adequate, why this happened?
>
> A.    I believe that, as I said in my subsequent report, it happened because of
> the specific arrangement and detail of the hatch in question.  It's off
> standard, not normal, not designed or constructed or installed in what I
> would call normal marine practice.
>
> Q.    Okay. Can you explain that for the Court?
>
> A.    In general, any hatch -- any hatch that I've ever seen or on any vessel that
> I've ever sailed on or been involved in building or repairing are installed
> in such a way that the boards or the removal members cannot fall through
> the opening in which they rest.  It's precluded either by dimensions or by
> a lip or around the outside or by four lips, if there's a removal panel or
> board or hatch section.  It's in such a way that, regardless of the direction
> you move it, it's going to be supported and not be able to fall below.  If
> that's not the case, then the other alternative is to put a removal stay mid-

span so that if it's pulled off one edge it rests on that stay and, again, cannot fall through the opening.

(Kelley Trial Tr. 502:1-23.)

20.    Thomas Dyer, a naval architect and marine engineer, testified the upper pump room hatch cover was dangerous and the Corps had an obligation to mitigate the risk of harm. (Thomas Dyer Dep. 59:6-21, April 6, 2012.)  Dyer also stated:

Q.    And you haven't read the testimony of the person who designed it or of the half dozen other witnesses who talked about the design of it, the Cascade General people who talked about it, Bud Bronson who testified it, have you?

A.    The only evidence I have that I can base my opinion on is what happened to Economides when he lifted that corner and the thing fell through the opening should not have happened.

Q.    But you didn't even know that Cascade General had constructed this thing, did you?

A.    I don't see that that has anything to do with it.  I just think as a general principle, if you have a hatch cover that falls through the opening as easily as that, you have a problem.

(Dyer Dep. 60:5-64:15.)

21.    The panels on the hatch cover were at risk of falling even if lifted and moved forward or aft toward the adjacent panel.    (Sloan Trial Tr. 798:1-802:2.)    On one occasion, an ESSAYONS's crew member Patrick Sloan attempted to lift and slide aft the forward-most panel onto the immediately adjacent panel behind it.  (Sloan Trial Tr. 801:22-802:1.)  He grabbed the panel by the aft port corner handhold and lifted less than three inches before the panel slid off its narrow support and fell to the deck below.  (Sloan Trial Tr. 802:4-13.)  Sloan testified:

Q.    So just so we're clear, though, at this location -- you're familiar with these hatch covers; right?

A.    Yes.

Q.    This location, this hatch cover would have been supported on three sides, each end and on the forward edge?

A.    Correct, sir.

Q.    Okay. But it – how far did you lift it up, do you remember, to try to slide –

A.    Just enough to get it up over the edge.

Q.    Like –

A.    Because I know it was heavy, and so I was going to take and put it up on the edge and come over to here and pull this one up.

Q.    So do you think you lifted it more than – well, these plates are 3 inches thick, roughly?

A.    Roughly 3 inches thick.

(Sloan Trial Tr. 801:1-16.)

22.    The Corps' design team did not instruct the ESSAYONS's crew members on how to safely open the new hatch cover.  (Cinkosky Trial Tr. 348:21-24.)   Instead, the designer observed the ESSAYONS's crew open the hatch cover without any instruction and was satisfied they could do it safely without any direction. (Cinkosky Trial Tr. 348:21-349:7.)  During these test runs with the ESSAYONS's crew, two different crew members tried lifting a panel by themselves before realizing it was too heavy for one person.  (Cinkosky Trial Tr. 350-351.)

23.    After the 1991 modification, the Corps made no changes to the upper pump room hatch cover until after Tucker's accident.  (Cinkosky Trial Tr. 599:22-600:9.)

24.    At the shipyard, the upper pump room hatch cover keeper plates were either closed, *i.e.*, slid into position over the short side of the five hatch-cover panels, or simply left open. (Anderson Trial Tr. 50:16-21, 54: 9-12; Sloan Trial Tr. 806:12-18; Bristow Trial Tr. 1539:4-7.) The keeper plates were often slid back in the open position for easier access to the hatchway, for

Page 15 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

the benefit of the crew and shipyard repair workers. (McDonald Trial Tr. 73:12-74:10; Sullivan Trial Tr. 106:21-23.) In the closed position, the bolts usually were not tightened. (Sloan Trial Tr. 805:17-21; Bristow Trial Tr. 1539:4-19.)

25.     When docked in the yard, the ESSAYONS's crew members would perform daily security rounds. (Anderson Trial Tr. 48:10-12, 65:16-22.) Security rounds were performed primarily for purposes of fire and flood prevention. (Anderson Trial Tr. 60:6-62:1.) If, however, a crew member observed the keeper plates were not in the closed position, typically he would kick them back into place over the edge of the panels. (Sloan Trial Tr. 806:19-22.)

26.     On most mornings, the ESSAYONS' crew and shipyard repair workers met for production meetings in which they discussed safety concerns regarding scheduled projects. (McDonald Trial Tr. 78:8-18; Darren Stevens Dep. 32:6-14, Sept. 3, 2010.) The meetings provided an opportunity for the vessel's representatives to fulfil the vessel owner's obligation to warn shipyard repair workers about peculiar vessel-fixed equipment. (Kelley Trial Tr. 509:15-510:5.)

27.     If shipyard repair workers needed to open the upper pump room hatch cover, they notified the vessel's crew. (Cinkosky Trial Tr. 352:6-354:22, 631:20-632:9.) At the morning production meetings, Cascade repair workers would notify the ESSAYONS's crew if they needed the hatch cover removed; the ESSAYONS's crew would grant or deny permission. (Bristow Trial Tr. 1533:19-1534:9.) The ESSAYONS's crew assisted Cascade repair workers with operating the hatch cover in the upper pump room as needed. (McDonald Trial Tr. 75:24-76:15; Cinkosky Trial Tr. 353:23-354:6; Stevens Dep. 43:14-22, 52:2-12; Bristow Trial Tr. 1534:4-9.)

28.    Cascade assigned Darren "Nick" Stevens to the ESSAYONS to serve as the safety representative for the 2008 project. (Beck Trial Tr. 90:9-25.)  During Stevens's fifteen years at Cascade, he worked twenty to twenty-five different projects on the ESSAYONS. (Stevens Dep. 9:1-8; 21:14-22:20.)  Because he was so familiar with the vessel, Stevens typically was the lead safety representative or competent person assigned to the ESSAYONS when it was at the shipyard. (Stevens Dep. 21:14-22:20.)  In 2008, he attended onboard the ESSAYONS nearly every day. (Stevens Dep. 22:14-20.)

29.    In Stevens's experience, the ESSAYONS's crew, not shipyard repair workers, exercised active, operational control over the upper pump room hatch cover.  In fact, Stevens stated he never opened the hatch cover or witnessed any Cascade workers operate the hatch cover. (Stevens Dep. 40:20-41:15, 43:7-11.)  If shipyard workers needed the hatch cover opened, Stevens directed them to the ESSAYONS's crew. (Stevens Dep. 43:14-22.)

30.    Of the hundreds of repair workers at Cascade between 1991 and 2008, the evidence shows only two men operated the upper pump room hatch cover without assistance from the ESSAYONS's crew: Bristow and Sullivan. (Sullivan Trial Tr. 115:24-116:4; Bristow Trial Tr. 1529:25-1530:13.)

31.    No ESSAYONS's crew member or other Corps' personnel instructed Bristow on the Corps' method for opening the hatch cover. (Bristow Trial Tr. 1537:10-16, 1538:14-16.)  No ESSAYONS's crew or other Corps' personnel ever told Bristow there was only one proper way to remove the hatch cover. (Bristow Trial Tr. 1538:11-13.)  No ESSAYONS's crew or other Corps' personnel ever told Bristow he was responsible for teaching the riggers, or any of the other seven crafts at Cascade, how to safely operate the hatch cover. (Bristow Trial Tr. 1538:5-10.)  After the ESSAYONS's crew entrusted Bristow to remove the hatch cover, he developed

Page 17 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

his own procedure - a multi-step workaround - for removing the hatch cover. (Bristow Trial Tr. 1538:1-4, 1534:16-22.)

32.     For the workaround, Bristow sends a repairman down to deck below to clear the area. (Bristow Trial Tr. 1528:2-3.) Second, two other repairmen on his crew don safety harnesses and tie-in to a fixed point on the overhead for fall protection. (Bristow Trial Tr. 1528:3-5.) Next, the two men take positions at the short sides of the aft-most of the five panels. (Bristow Trial Tr. 1528:13-19.)   Gripping the handholds at each corner of the panel, each repairman lifts the forward side at an angle and slides it up and over onto the adjacent panel. (Bristow Trial Tr. 1528:18-21.) The men continue this process, using the next panel forward to bear the heavy weight of the panels. (Bristow Trial Tr. 1528:25-1529:5.)

33.     Sullivan also opened the upper pump room hatch cover without help from the ESSAYONS's crew. (Sullivan Trial Tr. 132:1-16.)   Sullivan is an expert and experienced repairman in his craft. (Kelley Trial Tr. 520:21-23.) Cascade carpenters primarily construct staging and scaffolding inside ships to serve as work platforms for the repairmen in the other crafts. (Sullivan Trial Tr. 108:3-14.)

34.     Sullivan developed a procedure similar to Bristow's for opening the upper pump room hatch cover. (Sullivan Trial Tr. 119:7-15, 120:16-126:15.)  Sullivan opened the upper pump room hatch cover approximately twelve times during his tenure at Cascade. (Sullivan Trial Tr. 115:24-116:4.) Contrary to Bristow and Stevens, Sullivan did not believe Cascade repairmen needed permission from the ESSAYONS's crew to open the hatch cover. (Sullivan Trial Tr. 132:1-16.)

35.     The Corps never prepared any written instructions regarding a safe procedure for removing the hatch cover. (Cinkosky Trial Tr. 349:20-25; McDonald Trial Tr. 70:24-71:2.)  No

Page 18 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

warnings were ever posted on or near the new hatch cover arrangement. (Cinkosky Trial Tr. 349:20-25; McDonald Trial Tr. 74:22-75: 6.) In the marine industry, warnings are customarily utilized when hazards cannot be eliminated through the design process. (Clement Trial Tr. 687:18-688:4; Kelley Trial Tr. 512:4-20.)

III.    The Accident

36.    During the winter months, the ESSAYONS would go into Cascade's shipyard annually for maintenance and repairs pursuant to a maintenance and repair contract ("M&R Contract") between the United States and Cascade. (Sullivan Trial Tr. 131:8-21; Docherty Trial Tr. 246:20-22.) The M&R Contract was a five-year maintenance contract in place for annual dry-docking, sea-values, and similar routine maintenance. (Adam Beck Trial Tr. 86:5-9, April 28, 2014.) The M&R Contract imposes the Corps' safety standards on Cascade. (Beck Trial Tr. 89:24-90: 8.) The Safety Manual in effect at this time was the 2003 edition. (Def.'s Trial Ex. 514.)

37.    In 2008, Cascade was also performing work under a repower contract with the United States. (Beck Trial Tr. 85:19-86:10.) The repower contract involved substantial work to the vessel, including replacing the main engines, dredge engines, power generation and a large automation upgrade on the dredge. (Beck Trial Tr. 86:1-4.) Consequently, the ESSAYONS spent the majority of 2008 at Cascade's shipyard. (Darren Stevens Dep. 22:14-16, Sept. 10, 2010.)

38.    Cascade sub-contracted the M&R tank cleaning work to West Coast Marine Cleaning. (Beck Trial Tr. 86:11-14; 85:22-86:18; Pl.'s Trial Ex. 308.)

39.    Economides worked for Cascade for a few years in the carpentry craft in the 1990s; he returned in January 2008, and worked his way up to carpentry foreman by September 2008.

(Joshua Economides Trial Tr. 139:2-140:3, April 28, 2014.) Economides was well-trained, and was an expert and experienced shipyard carpenter. (Kelley Trial Tr. 501, 520: 13-18.)

40.     On the afternoon of September 26, 2008, Sullivan sent Economides over to the ESSAYONS with a three-man team to retrieve carpentry tools and equipment that had been left on the vessel's lower decks. (Economides Trial Tr. 140:7-23.) Economides's team formed a "human chain" to pass the materials from the lower decks, up the stairs, and out onto the top weather deck where a crane could hoist them off the ship.    (Economides Trial Tr. 141:1-17.) Economides encountered a problem removing an eighteen-foot ladder from the upper pump room out through the overhead access hatch up to the weather deck. (Economides Trial Tr. 142:10-144:10.)  The ladder was too long and the overhead too low for Economides to achieve the right angle to lift the ladder through the above hatchway. (Economides Trial Tr. 143:23-144:10.)

41.     Economides observed the upper pump room hatch cover for the first time. (Economides Trial Tr. 144: 11-18.) The keeper plates were in the open, unsecured position, and there were no warning signs to indicate he should not open the hatch cover. (Economides Trial Tr. 146 2-4, 174:17-175:6, 151:23-152:2, 154:23-155:3.) He thought if he removed one of the below panels, he could lower the ladder down through the opening in the deck, and lift the ladder straight up and out of the overhead hatch to the weather deck.   (Economides Trial Tr. 144:11-18.) Economides was unsure whether his team could remove the hatch-cover panels or if they would need assistance from the rigging craft. (Economides Trial Tr. 148:14-24.)

42.     In order to test the weight, Economides grabbed one corner of a hatch-cover panel and raised it roughly one foot. (Economides Trial Tr. 149:1-3.) When he did so, the panel came off the narrow flange on the opposite corner and fell through the opening. (Economides Trial Tr.

Page 20 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

149:1-25, 153:2-9.) Economides held on to the hatch cover panel for as long as possible, but it was simply too heavy to hold. (Economides Trial Tr. 149:20-25.) The panel fell to the lower pump room, crashing into one of the dredge pumps and striking Tucker in the head, causing serious injuries, most notably a traumatic brain injury. (Economides Trial Tr. 149:25-150:2; Def.'s Trial Ex. 500D.)

43.    Economides had no idea he could pull the panel off the opposite side so easily or it would fall through the opening it was designed to protect. (Economides Trial Tr. 152:24-153:9.) He had dealt with many hatch covers aboard ships, but had never encountered a hatch cover like the one on the Dredge. (Economides Trial Tr. 171:7-24, 152:20-23, 155:4-5.)

44.    Since 2000, Lindsay Docherty has been Cascade's Director of Quality, Safety and Security. (Docherty Trial Tr. 182:2-10.) Docherty conducted an accident investigation and prepared a report. (Pl.'s Trial Ex. 301.) He determined the accident occurred because Economides did not appreciate the inherent risk of the peculiar, unsecured hatch cover falling when he tested its weight. (Pl.'s Trial Ex. 301 at 2, 3.) Docherty described the hatch cover as a "one-off" of all hatch covers on ships he had ever seen. (Docherty Trial Tr. 200:12-19, 248:22-249:12.) The Corps never warned Docherty of the unique hazards of the hatch cover that were not apparent when the hatch cover was closed. (Docherty Trial Tr. 246:23-247:2, 221:12-15, 222:1-5.)

IV.    Tucker's Injuries

45.    Paramedics arrived on the scene and attended to Tucker as he lay on the deck of the lower pump room. After approximately one hour, the paramedics placed Tucker on a stretcher board and he was lifted by a crane out of the vessel, and life-flighted to Emanuel Hospital, in Portland, Oregon. In route, the paramedics indicated he scored "<13" on the Glasgow Coma

Page 21 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

Scale. (Pl.'s Trial Ex. 324 at 1.)  At the hospital, Dr. David E. Adler performed an emergency craniotomy.  (Pl.'s Trial Ex. 318A at 7-8; David E. Adler Trial Tr. 1200:14-1201:15, May 20, 2014.)

46.    Dr. Adler diagnosed a traumatic brain injury.  After Tucker was released from the hospital, he began treatment with a number of doctors in different disciplines during his convalescence, including:  Dr. Adler (Neurosurgeon); Dr. Jaime Nicacio (Physiatrist); Dr. Danielle L. Erb (Physiatrist); Dr. Philemon Anderson (Otolaryngologist); Dr. John W. Reski (Optometrist); Dr.  Stephen Mitchell (Endocrinologist); Dr.  Anne Hamburg (Neurologist). (Pl.'s Ex. 318.)

47.    Tucker's physicians diagnosed the following symptoms caused by his traumatic brain injury, many of which persist to this day:  (a) sensor-neural hearing loss with tinnitus in his left ear; (b) partial vision loss in his left eye;[7] (c) anosmia (lack of sense of smell); (d) aguesia (lack of sense of taste); (e) hypogonadism; (f) erectile dysfunction; (g) left-sided weakness, numbness and sensory loss; (h) palmar drift and lower extremity weakness; (i) fatigue, including brain fatigue; (j) cognitive deficits, including the ability to efficiently process information; (k) short term memory loss; (l) post-traumatic vestibular dysfunction, including disequilibrium;[8] (m)

---

[7]Dr. Reski, Tucker's optometrist, testified to symptoms caused by the accident.  He prescribed prism corrective lenses which, when worn, correct most of Tucker's problems except his convergence difficulties (inability to coordinate his eye movements, which causes fatigue) and his peripheral visual motion processing, which affects his ability to judge objects in motion in space, such as cars approaching him in oncoming lanes of traffic.  (John W. Reski Trial Tr. 1261:22-1262:17, May 20, 2014.)

[8]Dr. Anderson diagnosed Tucker with hearing loss, disequilibrium, light-headedness, double vision and sensitivity to light and tinnitus.  He said the symptoms were caused by the accident and were permanent.  (Philemon Anderson Trial Tr.1064:22-1065:18, 1066:7-1067:1, May 19, 2014.)

headaches; (n) vertigo; (o) insomnia; (p) C6-7 disk protrusion; (q) posttraumatic epilepsy (seizure disorder); and (r) depression and anhedonia. (Pl.'s Trial Ex. 318B at 29-65, 68-76, 78-81, 85-100; Pl.'s Trial Ex. 318H at 2-9; Pl.'s Trial Ex. 318L at1-26; Jaime Nicacio Trial Tr. 903: 18-911:20, May 19, 2014; Danielle Erb Trial Tr. 1099:2-1100:22, 1102:3-1104:16, 1105:20-1106:13, May 20, 2014; Anne Hamburg Video Tr. 7:3-5, May 21, 2014.)

48.    Tucker underwent extensive physical therapy after his release, primarily at Progressive Rehabilitation Associates ("PRA"), under the supervision of Dr. Erb. (Pl.'s Trial Ex. 318C; Pl.'s Trial Ex. 318G; Pl.'s Trial Ex. 318I.)

49.    Dr. Nicacio, Tucker's primary treating physician, began treating Tucker in January 2009, and continues to follow Tucker. Dr. Nicacio referred Tucker to the specialists listed above, with the exception of Dr. Adler, who performed the craniotomy the day of the accident. Dr. Nicacio testified Tucker reached maximum medical improvement in approximately two years, and his condition is now static and will require medical treatment for the remainder of his life. (Pl.'s Trial Ex. 318B; Nicacio Trial Tr. 902:25-907:1; 911:2-912:7; 915:8-14; 917:15-918:12.) Dr. Hamburg testified Tucker will require treatment for epilepsy for the rest of his life. (Hamburg Video Dep. 13:3-11.) Dr. Nicacio testified, to a reasonable degree of medical certainty, that Tucker's symptoms were caused by his traumatic brain injury resulting from the accident. (Nicacio Trial Tr. 916:22-917:9.) Dr. Erb, who supervised Tucker's treatment at PRA, agreed his symptoms were caused by the traumatic brain injury resulting from the accident. (Erb Trial Tr. 1104:17–1105:19, 1106: 19–1107:2.) Dr. Hamburg testified Tucker's epilepsy was caused by the accident. (Hamburg Video Dep. 12:22–13:2.) Dr. David Spencer, the government's medical expert (neurologist), acknowledged Tucker has epilepsy and it was caused by the accident. (David Spencer Trial Tr. 1304:25-1305:7; 1314:12-20, May 21, 2014.)

Page 23 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

50.    In 2010, Tucker became dizzy and lost his balance, causing him to fall in the bathtub. He struck his elbow on the porcelain and began experiencing pain, numbness, and tingling in his left forearm, hand and fingers. Dr. Adler diagnosed left ulnar nerve neuropathy, and performed a left cubital tunnel release. (Pl.'s Trial Ex. 318A at 25-26.) Dr. Erb opined that his fall was the result of his disequilibrium, which is caused by his traumatic brain injury. (Erb Trial Tr. Erb 1121:3-12; 1149:23-1151:22.) Tucker's fall at home in the bathroom in 2010, which resulted in ulnar neuropathy, was caused by the September 2008 accident.

51.    After the accident, Tucker experienced manifestations consistent with tonic/clonic seizures, but he did not immediately seek treatment. (Kirk Porter Trial Tr. 847:1-848:8, May 1, 2014; Ella. Porter Trial Tr. 877:10-881:15, May 1, 2014.)  On August 13, 2010, Tucker experienced what was characterized as a grand mal seizure, and was taken to the hospital emergency room. (E. Porter Trial Tr. 877:10–881:15; Pl.'s Trial Ex. 318B at 47-48.) As a result, Dr. Erb opined Tucker was at risk for traumatic epilepsy, and if he experienced another seizure, he had probable seizure disorder. (Erb Trial Tr. 1124:3-1126:19.) Dr. Erb expressed the opinion that Tucker was at increased risk of further injury because of his epilepsy. (Erb Trial Tr. 1161:19-22.) Tucker continued to experience both tonic/clonic seizures and, on February 1, 2012, he had a grand mal seizure at a routine appointment with Dr. Nicacio. (Pl.'s Trial Ex. 318B at 74.)

52.    Dr. Nicacio referred Tucker to a neurologist, Dr. Hamburg, who began treating him for epilepsy. (Pl.'s Trial Ex. 318L; Hamburg Video Dep. 6:5-7.) Dr. Hamburg diagnosed post-traumatic epilepsy and began a course of continuing treatment. (Hamburg Video Dep. 7:3-5, 16-18.) On July 16, 2012, Tucker suffered a seizure at Dr. Hamburg's office. (Hamburg Video Dep. 11:17-12:3.) Initially, Dr. Hamburg ordered Tucker not to drive but, in February 2013,

Page 24 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

Tucker was released to drive.  (Pl.'s Trial Ex. 318L at 8, 22.)  Dr. Hamburg treats Tucker with two anti-seizure drugs and believes he will require continued treatment for the rest of his life. (Hamburg Video Dep. 8:3-19; 13:8-11.)  Dr. Spencer concurred with Dr. Hamburg and agrees it is more likely than not Tucker's seizure disorder was a result of the accident.  (Spencer Trial Tr. 1282:20-1283:13, 1314:12-20.)

53.    Tucker's doctors have uniformly testified his symptoms listed above are the result of the traumatic brain injury he sustained in the accident.  (Nicacio Trial Tr. 916:23-917:9; Erb Trial Tr. 1104:17-1105:19, 1106:19-1107:2; Hamburg Video Dep. 12:22-13:2.)

V.    Tucker's Restrictions and Impairments

54.    Tucker worked for West Coast from the age of 18 until his injury.  (Philip Tucker Video Dep. 7:20-22, May 14, 2014.)  Prior to the accident, Tucker was described as a "go to" worker; he had the reputation of being a very hard worker.  (Mauricio Palemeno Trial Tr. 260:11-14, April 29, 2014.)  There was always work available for Tucker.  (Robert Baker Trial Tr. 284:6-16, April 29, 2014; K. Porter Trial Tr. 837:4-5.)

55.    Dr. Nicacio eventually released Tucker to work eight hours per week, and expressed a hope he could work up to six hours per day (with appropriate restrictions such as a lifting limitation up to twenty-five pounds).  (Pl.'s Trial Ex. 318B at 47, 54.)  After Tucker began working four hours per day, two days per week, however, Dr. Nicacio noted Tucker was exhausted and required a period of rest and recovery, including one day off.  With the benefit of further observation while Tucker attempted to work four hours per day, two days per week, Dr. Nicacio expressed the opinion that Tucker could not work four hours per day, three days per week, and concluded Tucker will never be able to return to full-time work.  (Pl.'s Trial Ex. 318L at 54-57; Nicacio Trial Tr. 925:4-20; 963:5-13.)  Similarly, Richard Ross, one of Tucker's

Page 25 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

vocational experts, testified it was possible, but not probable, that Tucker may be able to engage in part-time benevolent work. Applying a transferrable-skills analysis, and considering Tucker's 8th grade education, pre-injury skills as a laborer, his aptitude, abilities and the fact he always worked for the same employer, Ross concluded he would not be able to secure employment in the competitive marketplace. (Richard K. Ross Trial Tr. 436:20-438:14, April 20, 2014.)

56.    After his injury, West Coast provided Tucker with part-time employment two days per week, four hours per day. (Tucker Video Dep. 31:6-12.) This was benevolent employment which was unavailable in the competitive market. Tucker washed trucks and performed some janitorial work. (Tucker Video Dep. 30:7-8.) Due to fatigue, Tucker was unable to work more than two half days per week. (Tucker Video Dep. 31:23-25.) Baker testified Tucker could not handle the physical demands of even a modified, benevolent job, had no energy, fatigued easily and appeared to have very low self-esteem. (Baker Trial Tr. 288:19-23.) After Tucker began experiencing seizures, Baker declined to provide benevolent employment because he was concerned Tucker might injure himself or others if he had a seizure at work. (Baker Trial Tr. 291:5-13; Tucker Video Dep. 32:1-9.)

57.    Tucker applied for social security disability benefits and was found to be disabled. (Pl.'s Trial Ex. 326 at 6.)

58.    Tucker is more susceptible to fatigue because of his complex brain injury. As a result of the scarring of his brain tissue, electrical impulses from neural transmitters in the brain must travel further on extended neural pathways to avoid scarred brain tissue and reach the receiving neurons. This results in Tucker expending and consuming more energy than a neuro-typical person. (Erb Trial Tr. 1147:6-19; Nicacio Trial Tr. 973:22-978:8.)

59.     Because of his limitations, particularly his cognitive limitations, Tucker has significant difficulty processing sensory input, and performing day-to-day tasks.  Due to short-term memory deficits and brain fatigue, Tucker experiences difficulty organizing his activities.  Drs. Nicacio and Erb explained at length how these limitations affect him in his day-to-day life.  For example, shopping is challenging because of memory difficulties, brain fatigue and his inability to filter sensory input which he encounters in environments such as a grocery store.  In addition, before the accident Tucker could repair and maintain his car and those of his friends, and could comprehend automobile repair and maintenance technical manuals.  (Tucker Video Dep. 24:7-21.)  Tucker no longer is able to absorb and comprehend written information, particularly technical information, and his ability to perform repair work on automobiles is compromised.  As a further example, Tucker would help Chelsea with her homework, but has difficulty doing so now because he cannot process much of the information in her textbooks.  (Tucker Video Dep. 24:22-25:1.)  This causes Tucker frustration, stress, and anxiety.  (Tucker Video Dep. 26:15-22.)  All of these difficulties are attributable to Tucker's traumatic brain injury.  (Nicacio Trial Tr. 973:22-978:8; Erb Trial Tr. 1147:6-19, 1152:6-1161: 8.)

60.     Tucker is the primary custodial parent for his daughter.  Tucker is raising and caring for Chelsea and creating a home for them.  (Tucker Video Dep. 43:11-12, 49:9-15.)

61.     Tucker's sexual function has been substantially impaired, and the medicine prescribed for erectile dysfunction gives him severe headaches.  (Tucker Video Dep. 26:15-22.)

62.     The accident on the ESSAYONS resulted in a qualitative difference in Tucker's life, his experiences, and his relationships.  The testimony by Tucker's family - his daughter, his step-father and his mother - was moving.  Chelsea described her father before and after his injuries.  Prior to the accident Tucker spent significant time with Chelsea - at the park, swimming, reading

to her and helping with her homework.  After the hatch-cover panel struck Tucker in the head, his family life changed.  For Tucker and Chelsea to lose these growing-up experiences is life-changing for both of them and may never be recaptured.  Chelsea explained:

> Q.    How about your family activities?  How have they changed?
>
> A.    We don't really do anything anymore like we used to.  We don't, like, go to the park and all that or do picnics anymore.
>
> Q.    How about -- how about family get-togethers?  Do you guys do those as much?
>
> A.    No.  Last time we did that he started to freak out and he had to leave early.
>
> . . . .
>
> Q.    Just, in general -- I mean, not necessarily doing stuff around the yard, just being with your dad now versus what it was like beforehand?
>
> A.    He's, like, sad now, and he used to be happy.

(Chelsea Tucker Trial Tr.  827:14-22, 830:13-16, May 1, 2014.)

63.    The testimony of Tucker's step-father, Kirk Porter:

> Q.    Can you -- for the Court, can you describe Phil, in terms of things that he liked to do before the accident?
>
> A.    He was always pretty outgoing, liked to spend a lot of time with his friends, play sports, spend time with his daughter.  We did some golfing.  He had friends in Washougal he would go see all the time.  I'm not sure.  I think they went fishing or whatever.
>
> . . . .
>
> Q.    How would you describe his attitude, in terms of, you know, how he faced the day, in terms of --
>
> A.    Oh, he's always laughing, smiling, cracking jokes, happy-go-lucky kind of guy.
>
> Q.    Okay.  And how about his physical -- was he physically capable of doing most activities a man that age could do?

Page 28 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

A.      He was in excellent shape.

. . . .

Q.      Okay. Tell us -- if you can tell the Court now -- the Court's already heard from his daughter. If you could tell the Court now what Philip is like.

A.      Now what he's like?

Q.      Yes, sir.

A.      He's different. Different than he was. No doubt. Just don't have a lot of energy. He stays at home a lot. I think he's -- I think he's depressed. And he doesn't golf with me anymore. I think he's afraid of getting in public -- you know, around too many people. He doesn't like change. He likes -- change hurts him. He gets nervous, starts quivering. He has seizures now.

(K. Porter Trial Tr. 834:13-19, 844:2-13, 833:20-834:1.)

64.    And finally, the testimony of Tucker's mother, Ella Porter:

Q.      How would you describe your son before -- before his accident? What was he like?

A.      He was always full of energy, always on the go. He was one of those people who always wanted to help everybody else. Everybody who needed a helping hand, call him. "Phil, can you help me do this? Can you help me do that?" He was there. He was always swimming, taking Chelsea places. Gold panning, that was his thing, in the Washougal River. He was always up there doing that. And he just loved that. He was -- eat, always laughing, joking. He was just a whole different person, you know.

Q.      How would you describe his outlook on life?

A.      He was -- thought he could conquer the world. He was always saying he was gonna have all these patents and inventions. He was going to be a millionaire because his ideas was going to sell. He was a great inventor. You know, he was always, "I know I'm gonna have something really good. I'm know I'm gonna make something. I know I can." He was always sitting around drawing prints and, "No, this is" -- he'd crumple it. "This is a mess." But he was always trying. "I know it's there. I know I can do it." And then he would just -- after he got hurt, he just quit doing anything like that. He was -- I had his paperwork for a long time. I said, "Don't you want to patent this? Don't you want to do something with

this?"  He goes, "Maybe eventually."  He goes, "I don't know, Mother.  I don't know if it will work anymore."  And before he knew it would work. It was the best thing ever -- you know, to him, it was the best idea in the world.

. . . .

Q.    How would you characterize Philip's life now?  What is he like?  What's his outlook? How is he?

A.    He's like an old man.  It's like he got old overnight.  He's exhausted all the time.  He tries too hard.  It's not -- he's -- I guess he's -- I don't know how to put it.  He's real slow now.  It's like he's not the same -- you know, energetic, not ready to get up and do things.  It's like he sits back and he's too cautious, and he's like -- he grew old overnight. It's like there's no -- no -- you know how like -- like me, I know I'm tired all the time, you know, and I plan everything ahead, how much time I've got to do it, and -- you know, so I won't be wearing myself thin.  Now he basically has to do the same thing.  He put notes wherever to remind him what he needs to do, when he needs to do it, so he won't forget to pay his bills, go get his meds, take his meds.  You know, the only thing that's never slipped his mind is Chelsea.  "I gotta to pick her up from school." That's just -- that just amazes me.  You know, because he knows every day he's got something to do at that time, and it's Chelsea.

(E. Porter, Trial Tr.  861:21-863:12, 881:16-882:11.)

## CONCLUSIONS OF LAW

I.    <u>Jurisdiction</u>

1.    As a threshold matter, the court must enunciate the basis for jurisdiction in this court.  In the Revised Joint Pretrial Order, Tucker asserted jurisdiction under 28 U.S.C. § 1333, and 46 U.S.C. § 31101.  The United States maintained jurisdiction was premised on the Public Vessels Act ("PVA"), 46 U.S.C. §§ 31101-31113, and the consistent provisions of the Suits in Admiralty Act ("SIAA"), 46 U.S.C. §§ 30901-30918.

2.    Under § 31102 of the PVA, the United States is liable in admiralty for "damages caused by a public vessel of the United States."  46 U.S.C. § 31102.  The PVA contains a special

Page 30 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

reciprocity requirement that permits foreign nationals to sue the United States government only if their country of nationality would permit a similar suit by a United States citizen.  46 U.S.C. § 31111.  Civil actions brought pursuant to the PVA are "subject to the provisions of . . . [the SIAA] except to the extent inconsistent with" the PVA."  46 U.S.C. § 31103.[9]

3.     In a prior decision during the course of this litigation this court stated:  "The two remaining jurisdictional allegations, the PVA and admiralty, are effectively the same.  The PVA, as previously discussed, creates admiralty jurisdiction for maritime claims.    Thus, the jurisdictional basis for Plaintiffs' claims against the United States is in admiralty"  *Tucker v. United States*, No. 3:09-cv-1491-AC (D.  Or.  Oct. 24, 2011) (docket number 123).

4.     Both the PVA and the SIAA waive the United States' sovereign immunity.  46 U.S.C. § 30903, § 31102.   *Powell v.  United States*, No.  05-cv-6193-AA, 2007 WL 2292693, at *4 (D. Or. 2007)  Moreover, the PVA expressly provides for damages.  46 U.S.C. § 31102.  Neither the PVA nor the SIAA, however, contain a jurisdiction-conferring provision.  Rather, subject matter jurisdiction over actions arising under the PVA and the SIAA is founded upon 28 U.S.C. § 1333.  *United States v. Park Place Associates, Ltd*, 563 F.3d 907, 923 (9th Cir.  2009).  Consequently, subject matter jurisdiction in this case is premised upon 28 U.S.C. § 1333, but provisions in both the PVA and SIAA are applicable to the court's determinations below with respect to Tucker's entitlement to an award of pre-judgment interest and the applicable rate for an award of post-judgment award.

---

[9]The SIAA is broader:  it allows the United States to be liable in admiralty in any case in which, "if a private person or property were involved, a civil action in admiralty could be maintained." 46 U.S.C. § 30903.  The SIAA contains no reciprocity requirement.

II.     Liability

5.      This action against the United States is subject to section 905(b) of the Longshore and

Harborworkers' Compensation Act ("LHWCA"), 33 U.S.C. § 905(b), and the duties set forth by

the United States Supreme Court in *Scindia Steam Navigation Co., Ltd. v. De Los Santos*, 451

U.S. 156 (1981).  Tucker asserts a third-party vessel negligence claim against the United States

under section 905(b), which permits a worker to recover from a vessel owner for personal injury

"caused by the negligence of [the] vessel." 33 U.S.C. § 905(b).  The right to pursue a negligence

action against the owner of a vessel under section 905(b) of the LHWCA is exclusive of other

theories of recovery. *Scindia* , 451 U.S. at 165.

6.      At the outset, it is important to recognize this court is responsible for separating the

negligence of the stevedore, Cascade, from the negligence of the United States, the vessel owner.

Indeed, the first sentence of § 905(b) authorizes a longshoreman whose injury is caused by

negligence of a vessel to bring a separate action against the vessel as a third party.  33 U.S.C. §

905(b).  Although as the Supreme Court noted in *Scindia*, the legislative history of § 905(b) does

not "furnish[] sure guidance for construing § 905(b)[]," 451 U.S. at 165, the Committee Reports

do provide a window into Congressional intent for that provision.   Specifically, the vessel's

liability was to be "based on its own negligence" and proved only if it was shown "to have acted

or have failed to act in a negligent manner such as would render a land-based third party in

non-maritime pursuits liable under similar circumstances."   S.Rep.No.92-1125, p. 11 (1972).

Simply put, the fact of Cascade's negligence in this case does not absolve the United States of its

duties under *Scindia*.

7.      In *Scindia*, the Supreme Court defined the scope of a vessel owner's responsibilities

under § 905(b) and outlined three duties shipowners owe to longshoreman.  451 U.S. 156.  These

Page 32 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

duties include:    (1) the "turnover duty," relating to the condition of the ship upon the
commencement of stevedoring operations; (2) the duty to prevent injuries to longshoremen in
areas remaining under the "active control" of the vessel; and (3) the "duty to intervene."
*Martinez v. Korea Shippinc Corp. Ltd.*, 903 F.2d 606, 608 (9th Cir. 1990) (citing *Scindia*, 451
U.S. at 167, 172, 175-76.).[10]   Tucker contends the government breached all three duties.   The
court considers each of the duties set forth in *Scindia* and relied upon by Tucker to establish the
liability on the part of the United States.

8.      The "turnover duty" relates to the condition of the ship upon the commencement of
stevedoring operations.   This duty places two responsibilities upon the vessel owner.   First, the
owner owes a duty to exercise ordinary care under the circumstances to turn over the ship and its
equipment in such condition that an expert stevedore can carry on stevedoring operations with
reasonable safety.   *Scindia*, 451 U.S. at 167.   Second, the owner owes a duty to warn the
stevedore of hazards or dangers which are known to the vessel owner or should have been
known to it and are likely to be encountered by the stevedore, but not known to the stevedore.
*Id.*   The duty to warn of hidden dangers is narrow and does not include dangers known or
anticipated by, or obvious to the longshoreman "if reasonably competent in the performance of
his work." *Id.*; *accord Delange v. Dutra Const. Co, Inc.*, 183 F.3d 916, 921 (9th Cir. 1999).

---

[10]Although in *Scindia* the Supreme Court discussed the respective duties of a vessel
owner and stevedore, subsequent Ninth Circuit law makes it clear the rationale of *Scindia* applies
equally to questions of vessel owner liability for injuries to employees of an independent
contractor working aboard the vessel, and applies here to the scope of the government's duty, as
owner of the ESSAYONS, to Tucker, an employee of West Coast, an independent contractor,
who is covered by the LHWCA.  *Cook v.  Exxon Shipping Co.*, 762 F.2d 750, 752 (9th Cir.),
*amended on rehearing*, 773 F.2d 1001 (1985).

Page 33 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

9.    Important, however, is that the open and obvious restrictions on liability for the vessel owner relates to obvious cargo conditions and the attendant duty to warn, but does not permit the turnover of unsafe vessel equipment.    Indeed, the turnover duty cannot be avoided simply because the dangerous condition is obvious; turnover of an openly dangerous vessel condition is a breach of the duty of care. *See, e.g., Thomas v. Newton Int'l Enterprises*, 42 F.3d 1266, 1270-71 (9th Cir. 1994) ("It is the failure to eliminate an unreasonably dangerous hazard that constitutes a breach of the vessel's turnover duty of safe condition."); *Ludwig v. Pan Ocean Shipping Co., Ltd.*, 941 F.2d 849, 851 (9th Cir. 1991) ("The obviousness of the hazard, which disposes of [the shipowner's] alleged liability for breach of its turnover duty to warn, is not dispositive of the question of whether [a shipowner] breached its turnover duty of safe condition."); *Martinez*, 903 F.2d at 610 ("Under *Scindia*, the obviousness of the defect does not absolve the vessel owner of its duty to turn over the ship in a condition under which expert and experience stevedores can operate safely."). Ninth Circuit law is clear: failure to eliminate an unreasonably dangerous hazard constitutes a breach of the vessel owner's turnover duty of safe condition. *Thomas*, 42 F.3d at 1270-71; *Ludwig*, 941 F.2d at 851; *Martinez*, 903 F.2d at 610. To determine whether a particular hazard is unreasonably dangerous, a court considers the totality of the circumstances, including whether the hazard was avoidable. *Thomas*, 42 F.3d at 1271.

10.    The United States vigorously argues the turnover duty was not breached here because the design of the hatch cover was known to Cascade and, in any event, an experienced and expert stevedore could work around it safely as evidenced by the prior seventeen years of operation by Cascade without incident.  The evidence at trial was unequivocal:  two Cascade supervisors, Bristow and Sullivan, were aware of the dangerous nature of hatch cover, and Cascade employees who routinely worked with the hatch cover worked around the potential hazard

dozens of times.  Based upon this evidence, the government concludes Tucker cannot sustain "his burden of proving that an 'expert and experienced' ship repair worker would not have been able to safely remove the hatch cover." (United States' Proposed Conclusions of Law ¶ 8.)

11.    Alternatively, the United States contends even if the court determines the hatch cover constituted a dangerous condition such that an expert or experienced worker could not safely work around the hazards, the actions of Economides were the sole cause of the accident and harm to Tucker.  Specifically, Economides failed to clear the area below before he lifted the hatch-cover panel more than one-foot high despite knowing there were workers below.  (United States' Proposed Conclusions of Law ¶ 12.)  In addition, Economides's failure to conduct a job hazard analysis to determine the risks associated with the hatch cover was an "independent and superseding negligent act that requires a finding of no liability."  (United States' Proposed Conclusions of Law ¶ 16 (emphasis omitted).)

12.    The court turns first to the government's contention that it is absolved of responsibility to turnover the vessel in safe condition simply because some Cascade employees were aware of the dangerous nature of the hatch cover and were able devise a procedure to safely remove the plates.  While there is evidence some Cascade workers were able to avoid the dangers posed by the unique hatch cover, those facts are weighed in considering the totality of the circumstances and are not dispositive of the court's inquiry here.  Rather, it is simply one factor to consider in reviewing the totality of the circumstances surrounding the hazard and the accident as a whole. *See Thomas*, 42 F.3d at 1269 (material issue of fact regarding the "unreasonabl[e] danger[ ]" of an "'unguarded, uncovered deck opening or manhole positioned within two feet of the bottom of an access ladder'. . . ."); *Martinez*, 903 F.2d at 609 (whether an unguarded ladder opening on a lashing platform was unreasonably dangerous constituted a question of fact); *Scheuring v.*

Page 35 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

*Traylor Brothers, Inc.*, 476 F.3d 781, 788, 790-91 (9th Cir. 2007) (genuine issue of material fact as to whether the owner's ramp-float-skiff means of access to the vessel was unreasonably dangerous). In *Thomas*, the Ninth Circuit stated: "Any argument that the avoidability of a hazard should be analyzed separately from its dangerousness is simply a disguised assumption of risk or contributory negligence argument[]" and contrary to the LHWCA. 42 F.3d at 1271 n.5. The avoidability of a hazard, while relevant, is not determinative of whether the hazard was unreasonably dangerous. *Id.* at 1271.

13.    A preponderance of the evidence supports the conclusion the upper pump room hatch cover was a very unusual, if not unique, and hazardous design.  Virtually every maritime witness, whether an experienced stevedore or an expert naval architect, testified as to the unique or unusual design of the hatch cover.  Even setting aside the counter-intuitive fact the hatch cover easily could fall through the opening it was designed to cover, there are several other factors contributing to the dangerous nature of this hatch cover.  For example, the diamond plate covers and retractable hand holds give an impression the cover is light weight.  In addition, when one of the panels of the hatch cover is lifted from one side, the opposite side of the panel pivots on the narrow flange.  If the panel is lifted even slightly, or lifted to the side, it easily and without warning falls off the opposite narrow supporting flange.  Finally, the retractable keeper plates are not part of the hatch cover.  Furthermore, the hazards presented by the hatch cover were not discoverable by a routine examination.  Indeed, it was Economides's effort to ascertain the nature of the device that caused the harm to Tucker.  Based upon the evidence presented at trial, the court concludes the condition of the hatch cover in the upper pump room of the ESSAYONS is not something even an experienced longshore worker would have looked for or anticipated.

Page 36 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

14.    This case is distinguishable from the circumstances in *Bjaranson v. Botelho Shipping Corporation*, 873 F.2d 1204 (9th Cir. 1989). In that case a longshoreman was injured when he attempted to descend a "coaming ladder" of a hatch and fell to the deck due to poor lighting. In reversing the jury's entry of judgment against the vessel owner, the Ninth Circuit held plaintiff failed to make his "additional showing," that either the ladder or the hatch "was such that an expert and experienced stevedore would not 'be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property.'" 873 F.3d at 1208 (quoting *Scindia*). From the evidence presented at trial, all that was required to eliminate the "arguable" hazard entirely was to move a crane operated by the longshoremen. *Id.*; *compare Ludwig*, 941 F.2d at 851-52 (Ninth Circuit expressly recognizes circumstances such as *Bjaranson* in which an obvious hazard can be removed or easily avoided such that its presence cannot constitute a duty of safe condition; yet there are other circumstances in which an obvious hazard presents and unreasonably dangerous work environment).

15.    While the government insists this case is controlled by *Bjaranson*, the court cannot agree. Here the hatch cover was a permanent fixture of the vessel and, as set forth below, under the active control of the vessel's crew, rather than the stevedore. The hazards of the hatch cover were not obvious to those unfamiliar with its design. The fact some crew members were so informed and able to work safely around the dangers presented does not dictate a conclusion this hazard was such that an expert and experienced stevedore was able, by the exercise of reasonable care, to carry on its cargo operations safely. Contrary to plaintiff in *Bjaranson*, Tucker here made his additional showing by way of expert and lay testimony at trial that the hatch cover was dangerous and unexpected, *i.e.*, unreasonably dangerous.

Page 37 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

16.    There was ample competent evidence at trial to show the hazard presented by the hatch cover was such that an expert and experienced stevedore would not be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property. The testimony in this case was recurring and consistent; namely, the hatch cover was unique, deceptive in appearance, and unreasonably dangerous.  The United States breached its duty to exercise ordinary care and turn over the ESSAYONS in such a condition that an expert stevedore could conduct its operations with reasonable safety.

17.    Lastly, with respect to the turnover duty, the court considers the United States' arguments that Economides's acts and omissions supercede any liability on the part of the government.  The fact that others in Cascade's work force were aware of the dangers and that Economides's failed to clear the area below and conduct a job hazard analysis goes to the apportionment of liability in this case and not whether the hatch cover was unreasonably dangerous.  Economides's actions, while ill-advised, do not render an unreasonably dangerous condition created by the government reasonable or insulate the United States from liability.  First, Economides's actions were the very kind to be expected from the hatch cover's danger.  Second, it is clear under *Scindia* that both the vessel owner and the stevedore may be liable for injures to the worker.  The United States did not exercise ordinary care under the circumstances to turn over the ship's equipment - the hatch cover - in such condition that a worker on the ship such as Economides could carry out his responsibilities with reasonable safety.  Thus, the government breached the first responsibility imposed under the turnover duty.

18.    Tucker also contends the United States violated the second *Scindia* duty, active control. Under this second duty, a vessel owner may be liable for injuries if it:  (1) "actively involves itself in the . . . operations and negligently injures a longshoreman," or (2) fails to exercise due

care to protect longshoremen "from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation . . . ." *Scindia*, 451 U.S. at 167.

19.    Tucker contends the second part of the active control duty - failure to exercise reasonable care in areas or equipment remaining under the active control of the vessel - is implicated here. Specifically, Tucker argues the United States never relinquished total control over the hatch cover and, in fact, retained almost complete control over this equipment. The Supreme Court explains this second *Scindia* duty is breached when the vessel "fails to exercise due care to avoid exposing the worker to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel." *Scindia*, 451 U.S. at 167; *see also Howlett v. Birkdale Shipping Co., S.A.*, 512 U.S. 92, 104-05 (1994) ("The vessel's responsibilities . . . are commensurate with its access and control."). The "active control duty" requires the vessel owner to act reasonably to avoid exposing the stevedores to harm from hazards they may encounter in areas, or from equipment, under the active control of the ship. *Christensen v. Georgia-Pacific. Corp.*, 279 F.3d 807, 812 (9th Cir. 2002). The second *Scindia* "duty recognizes that although a vessel owner no longer retains the primary responsibility for safety in a work area turned over to an independent contractor, no such cession results as relates to areas or equipment over which the vessel's crew retains operational control." *Manuel v. Cameron Offshore Boats, Inc.*, 103 F.3d 31, 34 (5th Cir. 1997).

20.    In that regard, despite winding-up months of work on the ESSAYONS, Cascade never had control over the hatch cover and keeper plates. To the contrary, this equipment remained in the control of the Dredge's crew at the time of Tucker's accident. Specifically, the testimony was uncontroverted that the ESSAYONS's crew, not shipyard repair workers, exercised active,

operational control over the upper pump room hatch cover. If shipyard workers needed the hatch cover opened, Stevens directed them to the ESSAYONS's crew. (Stevens Dep. 43:14-22.) At the morning production meetings, Cascade repair workers would notify the ESSAYONS's crew if they needed the hatch cover removed; the ESSAYONS's crew would grant or deny permission. (Bristow Trial Tr. 1533:19-1534:9.) The ESSAYONS's crew assisted Cascade repair workers with operating the hatch cover in the upper pump room as needed. (McDonald Trial Tr. 75:24-76:15; Cinkosky Trial Tr. 353:23-354:6; Stevens Dep. 43:14-22, 52:2-12; Bristow Trial Tr. 1534:4-9.) Moreover, between 1991 and 2008, only two Cascade workers, Bristow and Sullivan, operated the upper pump room hatch cover without assistance from the ESSAYONS' crew. In fact, the crew had full access to the hatch cover and keeper plates, and it was Cascade who deferred to the crew's superior knowledge and handling of the hatch cover and keeper plates. The United States retained operational control over this equipment over the course of the work performed by Cascade, including the day of Tucker's injuries.[11] This

---

[11]Even if the court were to find the Corps and Cascade shared control over the hatch cover, courts in those instances consistently hold the *Scindia* active-control duty is implicated. *See, e.g., Davis v. Portline Transportes Maritime Internacional*, 16 F.3d 532, 537 (3d Cir. 1994) ("The active operations duty applies to those areas under the vessel's active control, even if the stevedore shares control with the vessel or if at some earlier time the area was under the stevedore's exclusive control."); *Lampkin v. Liberia Athene Transport Co.*, 823 F.2d 1497, 1502 (11th Cir. 1987) ("Establishing different standards of liability, contingent upon the degree of control exercised by the shipowner and the stevedore, is certainly desirable from a policy perspective. Otherwise, a shipowner would be free to ignore hazardous conditions that develop within areas under its exclusive or concurrent control, pending notification by the stevedore."); *Lambert v. United States*, No. C 11-725 MMC, 2013 WL 2403492, *2 (N.D. Cal. 2013) ("the control must be exclusive or concurrent" (quotations and citation omitted)); *Green v. United States*, 700 F. Supp. 2d 1280, 1303 (M.D. Fla. 2010) ( "The active operations duty does not require Defendant's exclusive control; concurrent control is sufficient to invoke the broader duty of care."), *aff'd*, 418 Fed. Appx. 862 (11th Cir. 2011); *see also Scindia*, 451 U.S. at 162 (exempting ship owner from liability for dangerous conditions created by the stevedore's negligence while the stevedore was in exclusive control over the manner and area of the work).

conclusion is supported by the preponderance of credible testimony that established the crew, not Cascade, retained ultimate control and authority over, the hatch cover and keeper plates. Thus, because the crew of the vessel retained operational control over the hatch cover, the United States may be liable to Tucker for its hazardous condition.

21.    Upon finding the government held active control over the hatch cover, the court must determine whether the United States failed to exercise due care to avoid exposing Tucker to harm from hazards in the area under its active control. The evidence demonstrates that, at the time of Tucker's accident, the design of the hatch cover constituted an unreasonable risk of harm to Tucker. Further, there was no evidence of work scheduled on the afternoon of September 26, 2008, requiring access via the hatch cover. Nevertheless, the keeper plates were slid back in the open, unsecured position thus allowing Economides to lift one of the plates and drop it through the unsecured opening. Further, in light of the inherently dangerous nature of the hatch cover, the crew should have been aware that leaving the keeper plates in the open position, in the absence of a warning, constituted a hazardous and dangerous condition which could result in one of the plates being lifted too high and cause it to fall through the unprotected opening. Indeed, the purpose of the hatch cover was to prevent both people and equipment from falling through the opening. The Corps should have ensured the hatch cover did not create the very hazard its proper placement was intended to prevent. The Corps did not exercise due care to protect Tucker from this hazardous condition. For these reasons, the United States breached its duty to avoid exposing Tucker to harm from a hazard under the active control of the vessel.

22.    This failure by the Corps, which constituted negligence, was a proximate, legal, and factual cause of Tucker's harm and resulting damages. Had the Corps either placed a warning sign or ensured the keeper plates were in place, Economides would not have attempted to lift the

Page 41 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

hatch cover.  Rather, he would have been prompted to seek the assistance of the crew, which, in turn, would have prevented the accident.

23.    The third duty outlined in *Scindia* is an exception to the generally limited duties imposed upon the vessel once operations have begun.  With respect to obvious dangers in areas under the principal control of the stevedore, the vessel owner must intervene if it acquires actual knowledge that:  (1) a condition of the vessel or its equipment poses an unreasonable risk of harm; and (2) the stevedore is not exercising reasonable care to protect its employees from that risk.  *Scindia*, 451 U.S. at 175-76.  It was on this theory of liability that plaintiff (longshoreman) in *Scindia* may have been entitled to go to a jury.  *Id* at 175-77 (If the vessel knew of the dangerous condition of the winch and the "improvident" failure of the stevedore to protect its employees from that known hazard, the vessel was under a "duty to intervene.").

The duty to intervene, however, is a narrow one.  A vessel owner has "no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore."  *Id.* at 172.  Nevertheless, vessel owners owe longshoremen the duty to intervene if the owners:  (1) know of a hazardous condition; (2) realize or should have realized that the condition presents an unreasonable risk of harm to the longshoremen; (3) know that the stevedore has failed to remedy that situation; and (4) helped to create the hazard.  *Torres v. Johnson Lines*, 932 F.2d 748, 750-51 (9th Cir. 1991) (citing *Scindia*, 451 U.S. at 175-76).

24.    Here, each of these factors is supported by a preponderance of the evidence.  As to the first, second, and fourth factors, there is no dispute the United States created and was aware of the hazards posed by the hatch cover; indeed, the government's design engineer testified to those dangers, including testimony that both the ESSAYONS's crew and Cascade had expressed

Page 42 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

concerns about the prudence of the design. (Cinkosky Trial Tr. 413-418, 586-590.) Moreover, given the hundreds of workers who came aboard the ESSAYONS over the years, combined with the Corps' active control over the hatch cover, the United States certainly should have known of the potential that someone may try to remove the hatch cover in a such a manner it would fall through the opening and cause injury. As to the third factor, the stevedore had no authority to remedy the situation because the hatch cover was under the control of the Corps, not the stevedore. The United States is liable to Tucker for breach of the duty to intervene.

III.    Damages

25.    The Supreme Court's decision in *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523 (1983), controls the award of damages in this case. Under *Jones*, Tucker is entitled to reimbursement for his loss of earnings and the impairment to his earning capacity; for medical expenses, past and future; and for any other economic loss he has sustained or is likely to sustain. Tucker is also entitled to recover for the non-economic components of his injuries, pain and suffering, and the impact of his injury on his ability to engage in activities that contribute to his quality of life.

26.    The court turns first to Tucker's economic losses - lost wages, impairment of future earning capacity, medical expenses, and household services - as a result of the accident. Tucker must present reliable evidence in support of his requested damages. In this case, Tucker relied primarily upon the testimony of two expert witnesses: Dr. Eugene Silberberg, an economist; and John Fountaine, a vocational rehabilitation counselor.

    A.    *Lost Earnings*

27.    The Supreme Court explained in *Jones*, that the two elements required to calculate a damage award equal to the present value of lost earnings are: (1) the amount the employee

Page 43 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

would have earned during each year he could have been expected to work following the injury; and (2) the appropriate discount rate, reflecting the safest available investment. 462 U.S. at 538. In so doing, courts may use a two-step method and discount the award of losses that accrued subsequent to the trial back to the date of trial and apply pre-judgment interest to losses that have accrued prior to trial from the dates they would have been received until the date of trial. Alternatively, as the Supreme Court recommends, a one-step method may be employed to discount the entire damage award, including both past and future losses, back to the date the loss occurred. To this amount, the applicable rate of pre-judgment interest is applied until the date of trial. *Id.* at 538 n.22. In this court's view, the preferred approach for calculating the present value of damages involves discounting the entire award back to the date of injury and awarding pre-judgment interest, if applicable, on that amount.[12]

28.    Lost earnings includes past wage loss - measured by the actual wage loss incurred by Tucker to the date of trial, and the value of proven benefits - and future earning capacity damages if there is evidence future earnings will be impaired as a result of the injury. Tucker presented substantial evidence in support of his request for lost earnings, past and future. Dr. Eugene Silberberg, Tucker's economist, testified at trial and provided the court with an analysis of Tucker's pre-injury earning capacity. With respect to past wages, the evidence at trial showed

---

[12]Dr. Silberberg and Fountaine discounted Tucker's future wages, costs and services to November 2013, rather than the date of injury, five years earlier. Dr. Silberberg testified that to further discount the values in Tucker's Trial Exhibit 330, the court should deduct 1% per year for the five years between September 2008 and November 2013, or multiply the September 2013 figure by .95. Consequently, at the request of Tucker's counsel, Dr. Silberberg discounted the figures to September 2008, the date of injury. (Pl.'s Trial Ex. 334.) The court notes Tucker's Trial Exhibit 334 reflects a .96 discount, rather than a .95 discount. Here, for the reason explained above, the court applies a .95 reduction to Silberberg's 2013 totals, but does so at the end of its analysis of Tucker's economic losses.

Tucker would have earned $124,480 in wages between September 26, 2008 (date of injury), and November 4, 2013 (approximate date of trial). In addition to sustaining a wage loss during that period, Tucker lost fringe benefits provided by his employer. The court accepts Dr. Silberberg's valuation of those benefits as 18% of payroll, which is applied to Tucker's earnings, to calculate that portion of his economic loss. The fringe benefits on Tucker's lost wages (.18 x $124,480) is $22,406. Accordingly, the total award to Tucker for lost wages, including fringe benefits, is $146,886.

29.    The court turns now to Tucker's future earning capacity. West Coast twice offered Tucker the position of foreman prior to the accident and both times he declined the position. (Baker Trial Tr. 285:17-23, 291:22-292:7.) Nevertheless, based upon the testimony of Tucker's expert, Tucker eventually would have accepted the proffered job of foreman, which paid $20-$21 per hour. (Baker Trial Tr. 283:1-6.) Additionally, it is reasonably probable Tucker would have attained the position of foreman because he had been performing foreman-like duties as a lead man before his injury. (Baker Trial Tr. 285:3–287:17.) The foreman job Tucker was offered was an intermediate position between a laborer, Tucker's job classification pre-accident, and a supervisor's job. (Baker Trial Tr. 285:17–287:17.) Consequently, the court determines that by November 2013, Tucker would have attained the position of lead man or foreman at West Coast and, as such, he would have earned $21 per hour, or approximately $60,000 per year. Based upon Tucker's work-life expectancy for a man with less than a high school education, active in the labor force, Dr. Silberberg projected that between November 2013, and the end of his work-life expectancy Tucker would have earned $983,896. In accordance with the Supreme Court's requirements in *Jones*, Dr. Silberberg applied a one percent net discount to determine the present value of Tucker's future projected earnings. The fringe benefits on Tucker's future

Page 45 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

earnings (.18 x $983,896) is $177,101.  Accordingly, the total for Tucker's future earnings, including fringe benefits, is $1,160,997.  Tucker was able to perform some work for West Coast after he was injured, but prior to the onset of his seizures.  The evidence at trial established Tucker earned $5,102 for that work.  As such, this amount must be deducted from Tucker's award for future earnings.  Consequently, Tucker's future loss of future earning capacity is $1,155,895.

30.    There was much dispute at trial regarding whether Tucker will be capable of employment in the future.  Based upon the evidence presented, the court has reached two conclusions.  First, prior to his injury Tucker was an industrious and valued worker.  He worked hard and took pride in the work he performed.  In turn, Tucker's employer rewarded his efforts with additional opportunities and responsibilities.  Tucker is a man who wants to work and who did good work.  The court's second conclusion is the constellation of impairments Tucker suffered because of the September 2008 accident prohibits him from sustained gainful employment in the future.

31.    An award for future wages is not subject to federal income taxes and thus should be based upon net earnings.  *Jones*, 462 U.S. at 534 ("On the other hand, the injured worker's lost wages would have been diminished by state and federal income taxes. Since the damages award is tax-free, the relevant stream is ideally of after-tax wages and benefits.")  Dr. Silberberg testified that approximately $55,000 should be deducted from Tucker's foreman wages for income tax.  (Silberberg Trial Tr. 1008:4-1009:22.)  Accordingly, the court deducts $55,000 in taxes from Tucker's future earnings and awards him $1,100,895 in damages for loss of future earning capacity.

*B.    Household Services*

32.    There is no question Tucker is now deprived of his ability to perform meaningful chores around his home. Economists agree "producing" useful work at home reflects income and if that cannot happen, a loss is incurred, *i.e.*, the value of services Tucker would have contributed to his household. That loss is measured by the cost to replace the labor. Here, Dr. Silberberg relied upon a survey by the Bureau of Labor statistics average wage data for the Portland, Oregon, region. The average wage for the category of building grounds workers, cleaners, and maintenance laborers was $12.68 an hour. Relying upon background information gathered from Tucker, Dr. Silberberg calculated the value of the services using the average hourly wage and based upon nine hours of household work per week, to reach a sum of $5,934, as the annual value of household services Tucker could no longer perform. Considering factors such as increased household productivity in younger years and reduced output later in life, Dr. Silberberg projected the time expended on household services over the remainder of Tucker's life expectancy, including a discount to present value, and arrived at the total sum of $218,938 for loss of the services. Although there was some testimony that Tucker continues to perform certain household chores, such as light grocery shopping and occasional yard work, the court is satisfied the amount requested for household services over Tucker's life expectancy is supported by substantial evidence in the record. To prevent a double recovery, however, the court deducts $40,048 from this amount,[13] and awards Tucker $178,890 for his loss of household services.

---

[13]An amount of $40,048 for "Yard/Home Maintenance" is requested and awarded pursuant to Tucker's Life Care Plan, discussed in paragraph 37 below.

C.    *Medical and Life Care Expenses*

33.    Past and future medical expenses are properly awarded as economic damages.  Agreed upon past medical expenses can be readily calculated.  Future medical expenses are estimated on the basis of medical testimony and the award is subject to discounting to prevent value.

Tucker requests an award of $195,643 for past medical expenses, and an award of $614,341 for future medical expenses and other services and medications discounted to present value as of November 2013.  (Pl.'s Trial Exs.  331 and 332.)  In support of his request for medical and rehabilitation treatment, services and equipment, Tucker presented substantial medical evidence by way of the testimony of his treating physicians, the economic testimony of Dr.  Silberberg, and the expert testimony of Fountaine, who prepared Tucker's Life Care Plan and also reviewed Tucker's past medical records for accuracy and to determine an amount for past medical expenses.  (Pl.'s Trial Ex. 332, John Fountaine Trial Tr. 1173:16-19, 1187:9-18, May 20, 2014.)  Fountaine consulted with Tucker's physicians and medical providers, who informed Fountaine of their prognoses for his necessary future care.  Based upon these discussions, Fountaine determined the need for future medical care and treatment, and its cost, in multiple disciplines for the remainder of his life.  Fountaine prepared a Life Care Plan that included necessary medical services as well as other vocational and domestic assistance, and the costs of prescription medications.  (Pl.'s Trial Exs. 331 and 332.) Dr.  Silberberg testified that in reaching this amount, he worked in the mid-range of costs outlined by Fountaine in the Life Care Plan.  (Silberberg Trial Tr. 1001:9-1002:8.)  Moreover, Dr. Silberberg discounted all medical services by applying a 1% net discount rate, but he utilized a 3% net discount rate for medical commodities.  Dr. Nicacio reviewed Fountaine's Life Care Plan and agreed the services were necessary.  (Nicacio Trial Tr.  926:11-20, 932:5-934:23.)

Page 48 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

34.    During trial, the court received extensive expert testimony, including the testimony of the United States' vocational rehabilitation and life care planning expert, Thomas Weiford, and the government's economic expert, Dr. Laura Taylor, regarding the Life Care Plan proposed by Fountaine.  The United States marshaled three primary challenges to the proposed Life Care Plan:  (1) Tucker's claimed entitlement of $195,643 for past medical expenses as not grounded in actual costs; (2) the Life Care Plan lump sum amount of $614,341 as unsupported by the evidence; and (3) several of the non-medical services requested because they will not be used by Tucker.

35.    At trial Fountaine conceded the $195,643 figure was not the actual amount paid to the physicians but, rather, represented the amount billed, prior to any adjustments that were ultimately "written off" by the doctors.  Fountaine explained his methodology was to "look at what the reasonable charges were and were they consistent with charges that we see in this area, in this region consistently." (Fountaine Trial Tr. 1223:13-16.)  Unlike future costs, a calculation of agreed-upon past expenses can be readily calculated.    It is unreasonable to seek reimbursement for amounts that were never paid.  Rather, in this court's view, an award for past medical expenses based upon the actual amount expended is appropriate. *See, e.g., Asanuma v. United States*, No.  12 CV 908 AJB (WMC), 2014 WL 1286567, at *3 n.2 ("While the medical expenses were billed at nearly ten (10) times this amount, the actual amount paid is the appropriate measure of damages.").  In this case, the United States represents that for the same period relied upon by Fountaine, the actual medical costs paid in full are $145,537.  (Pl.'s Trial Ex. 319.)  Consequently, Tucker is awarded $145,537 in damages for past medical expenses.

36.    Next, the United States contends the $614,341 amount requested by Fountaine in the Life Care Plan should be reduced to approximately $141,810 ($63,390 for the total present value of

Page 49 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

medical services, and $78,420 for the total present value of two anti-seizure drugs).   The government asks the court to use the medical costs projected by the Workers' Compensation Medicare Set-Aside Arrangement ("MSA")[14] to determine these future expenses, but for the cost of the seizure medications the United States prefers the prices projected by Fountaine in the Life Care Plan.[15]   At trial, Ro Baltayan, a vocation rehabilitation specialist with a certification for Medicare set-asides, testified on behalf of Tucker.  Baltayan explained:

> The MS[A] statutes advise that when a settlement occurs, whether it be in workers' comp or liability, auto, med mal, that -- and monies exchange hands that are anticipated to cover future medical care, that Medicare is to remain secondary. And over the years, particularly in workers' comp, there've been various memos produced which advise how it's best to do that.  And there are penalties if you do not do it.

---

[14]A Workers' Compensation Medicare Set-Aside Arrangement ("MSA") is a financial agreement that allocates a portion of a workers' compensation settlement to pay for future medical services related to the workers' compensation injury, illness, or disease.  These funds must be depleted before Medicare will pay for treatment related to the workers' compensation injury, illness, or disease.

42 U.S.C. § 1395y requires that those eligible for Medicare who are injured by and recover compensation in excess of $25,000 from a third party must set aside sufficient amounts to pay future medical expenses related to the injury if the injured party seeks reimbursement from Medicare should the set aside be insufficient.  To comply with Medicare set-aside requirements, Tucker employed Providio to prepare a proposed MSA to pay for future medical treatment of conditions caused by his injury. The MSA proposed an amount to pay for the costs of necessary medical care and drugs which would normally be covered ("covered expenses") by Medicare in the absence of the liability of a third party.  Providio prepared the proposal based upon the discounted rates which a longshore insurance carrier would pay for the covered expenses.  Ro Baltayan, a vocational rehabilitation specialist with a certificate for Medicare set-asides, proposed a $200,000 annuity which would generate and pay for projected expenses of $334,840.  Medicare approved Tucker's MSA proposal. (Pl.'s Trial Ex. 328; Ro Baltayan Trial Tr. 1654:16-1665:14, 1673:23-1675:10, May 23, 2014.)

[15]The total present value of the drugs project in the MSA was $154,964. Thus, the United States is selective in its use of that plan as a "supportable methodology" and providing "concrete evidence" of costs.

Page 50 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

So it is advisable when you settle your case that you put monies aside to protect Medicare's future interest. If you don't do it, Medicare can deny coverage until you spend down your entire settlement. So it's a risky proposition to not do it. And in workers' comp they really have got their act together, as opposed to liability, where there's still a lot of questions. There's lots of rules and regulations on how we do it, in terms of submission. It's a safety net to submit it. So it's highly recommended that you do something.

You don't have to do a Medicare set-aside, but it is the most recognized mechanism to look at what Medicare will pay for and to reserve some based on it.

(Ro Baltayan Trial Tr. 1657:1-22, May 23, 2014.) With respect to the covered services and rates applied in the MSA, Baltayan stated it includes only medical services Medicare will cover. Baltayan testified: "[T]here are many things they do not cover. So those items are not included in a projection as you see in a life care plan. *It's very different*." (Baltayan Trial Tr. 1662:12-15 (emphasis added).) In addition, the rates set forth in the MSA are the longshore rates, instead of the usual and customary rates, despite no guarantee Tucker will receive those rates. Rather, it will be incumbent upon him to negotiate for the best rates at the time of service. (Baltayan Trial Tr. 1664:12-16; *see also* Baltayan Trial Tr. 1675:9-10 ("There's no guarantee at all. You have to actually argue with each provider.").) The fees and charges set forth by the MSA do not provide a fair and comprehensive projection of the costs Tucker will incur for medical services over the course of his life and, as such, the court declines to rely upon the MSA to set Tucker's future medical expenses.

37.    The Life Care Plan seeks $40,048 for "Yard/Home Maintenance" over the course of Tucker's life. There was testimony at trial that, currently, Tucker is able to perform some of the home and yard chores and, for now, he declines to use certain other services provided for in the Life Care Plan. This fact alone is not sufficient to nullify the request for these costs. There is substantial evidence in the record to justify the need for these services over Tucker's life

expectancy and the projected costs. That Tucker is presently able to perform some household tasks is not determinative of his needs throughout his life. Tucker has provided substantial evidence in support of his request for future medical costs in the amount of $614,341.

38.    Based upon the foregoing, the court awards Tucker $2,077,187 for economic losses:

| Item of Damage | Reduction to Present Value From Date of Trial to Date of Injury (Multiplier of .95) | Amount Awarded |
|---|---|---|
| Past Lost Wages | 146,886 x .95 | 139,542 |
| Future Earnings | 1,100,895 x .95 | 1,045,850 |
| Household Services | 178,890 x .95 | 169,946 |
| Past Medicals | 145,532 x .95 | 138,225 |
| Future Medicals | 614,341 x .95 | 583,624 |
| **Total Economic Award:** | | **$2,077,187** |

D.    *Pain, Suffering and Loss of Enjoyment*

39.    The court must now determine the value of Tucker's pain and suffering, and his loss of enjoyment of life. This is perhaps the most difficult work a court must undertake, as its only guidance is the same subjective standard given to juries: the award should be reasonable based upon the evidence presented at trial.

The evidence at trial demonstrated beyond question that the consequences of the accident immediately and permanently affected almost every facet of Tucker's life. The initial injuries Tucker suffered caused excruciating pain and required surgery to save his life. Upon arrival at the hospital, Tucker reported he was unable to see, had a headache, was nauseous and could not concentrate. (Pl.'s Trial Ex. 318A.) Tucker was admitted directly to the operating room and,

within a short time, was intubated, chemically paralyzed, transfused and sent for cranial surgery. (Pl.'s Trial Ex. 318A.)  Following surgery, Tucker was transferred to the intensive care unit.  He remained in the hospital for six days and was discharged home to the 24-hour care of his wife and mother.  (Pl.'s Trial Ex. 318A; Tucker Video Dep. 14:7-10.)

Two weeks after his discharge from the hospital, Tucker was seen in the Legacy Multispecialties Clinic.  Tucker was accompanied by his family and the nurse case manager.  At that appointment, Tucker reported experiencing severe headaches, despite taking a daily maximum does of oxycodone, along with ringing in his left ear and numbness in his right knee and left shoulder.  The case manager and his family expressed concerns about Tucker's "affect and current condition."  (Pl.'s Trial Ex. 318A.)  There was discussion that Tucker may be depressed.  In addition, Tucker's mother reported she spent significant time with him each day and often Tucker would shake and his eyes would roll back in his head.  (Pl.'s Trial Ex. 318A.) Subsequently, Tucker was referred for various therapies and interventions, some of which continue to present day.  (Pl's Trial Ex. 318.)

The evidence showed the extent, variety, and permanence of Tucker's injuries.  His cognitive skills are impaired, making onerous even routine mental and intellectual tasks such as grocery shopping and paying bills, as well as affecting other activities necessary to maintaining full independence.  He has lost his ability to smell and to taste, depriving him of the ability to sense and enjoy food and drink which, in turn, has negatively affected his appetite.  He has suffered a partial hearing loss, and his eyes' ability to focus and adjust has been damaged.  His balance has been affected.  He tires easily and is phobic about being in public and around groups of people.  He suffers from intermittent seizures which, when they occur, result in a period of temporary incapacitation followed by an equal or longer period for Tucker to recover and

Page 53 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

reorient. He no longer can engage in the recreational pursuits he once enjoyed with his friends and family, such as golf and swimming, and no longer is able to help family and friends by doing yard work, home maintenance, or the many other handy-man chores he once performed with vigor and enthusiasm. The effect of Tucker's injuries prompted his mother to characterize him as "an old man" and his daughter to speak of him in the past tense, as if he no longer were living.

Perhaps the most profound consequence of Tucker's injuries has been to the relationship with his daughter. The evidence at trial established that before the accident Tucker enjoyed a strong, active, and robust relationship with his daughter. They regularly engaged in a variety of activities together and Tucker represented a positive and constructive presence in his daughter's life. Their relationship before the accident clearly was one each of them greatly enjoyed. Tucker's injuries, however, have taken away Tucker's ability to sustain that relationship and transformed it into something that bears little if any resemblance to the relationship they once enjoyed.

In short, the accident and resulting injuries effectively destroyed the person who was Philip Tucker, and replaced him with a barely recognizable surrogate. The accident and injuries left intact, however, Tucker's memories of who and how he had been, memories Tucker must live with every day of the rest of the life he has been handed. As relevant to the court's evaluation of the value of Tucker's pain and suffering, and loss of enjoyment of life, Tucker must also live out his life with the knowledge that he will never again be the person he had been before the accident: the helpful friend and family member, the near-indefatigable worker and handy-man, the engaged and playful father.

At the time of the accident Tucker was 33 years-old with a life expectancy of slightly under 45 more years. Tucker will live every day of the next four and one-half decades with the memory of the life he lost and knowledge that he never will regain it. Considering the severity and permanency of Tucker's injuries; his relatively young age at the time of injury; and the profound impact of his impairments on his autonomy, free will, personal relationships, and effect on the quality of life for the remainder of his life; the court awards Tucker $8,000,000 for his pain, suffering and loss of life's enjoyment.

        *E.*    *Pre- and Post- Judgment Interest*

40.    As this case is governed by the PVA, there can be no award to Tucker for pre-judgment interest, nor was it provided for by contract. 46 U.S.C. § 31107. Tucker is, however, entitled to post-judgment interest at the rate of 4% per year until the judgment is satisfied. 46 U.S.C. § 30911 ("judgment against the United States . . . under [SIAA] may include costs and interest at the rate of 4 percent per year until satisfied").

IV.    <u>Apportionment of Responsibility and Damages Awarded</u>

41.    Lastly, the court is responsible for separating the negligence of Cascade from the negligence of the United States and calculating the liability attributable to the government. *McDermott, Inc. v. AmClyde*, 511 U.S. 202 (1994). In *McDermott, Inc.*, the Court considered the proper method for calculating liability for nonsettling defendants in admiralty tort cases. After analyzing three alternatives, the Court concluded the liability of nonsettling defendants should be calculated with reference to the allocation of proportionate responsibility rather than giving nonsettling defendants a credit for the amount of the settlements obtained by plaintiffs. *Id.* at 204. Under *McDermott, Inc.*, "no suits for contribution from the settling defendants are permitted, nor are they necessary," because nonsettling defendants will pay no more than their

Page 55 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

share of the judgment. *Id.* at 209 (as determined by the factfinder). The Court noted joint and several liability allows a plaintiff to recover from one of many defendants when a plaintiff's recovery is limited by factors outside the plaintiff's control, such as a defendant's insolvency, thus making other defendants, rather than the innocent plaintiff, responsible for the shortfall. *Id.* at 220-21. When a settlement occurs, however, plaintiff's recovery has not been limited by outside forces, but instead by plaintiff's own decision to settle. *Id.* at 221. Thus, the Court found no reason to allocate a potential shortfall to a nonsettling defendant and allow plaintiff a double recovery. "Just as the other defendants are not entitled to a reduction in liability when the plaintiff negotiates a generous settlement . . . so they are not required to shoulder disproportionate liability when the plaintiff negotiates a meager one." *Id.*

42.    There is no question Economides's decision to test the weight of the hatch cover without first clearing the space below was irresponsible, at best. Stevedores understand and should abide the important principle that, prior to working above, you clear the area below; the evidence established this convincingly. Economides violated this fundamental principle and the result was devastating for Tucker. Nevertheless, Economides's failure to take certain steps required of all stevedores does not absolve the United States of its liability for creating an unreasonably dangerous condition on the ESSAYONS. Rather, Economides's actions warrant apportioning a share of the liability, and reducing the share of liability to be apportioned to the government in this case.

43.    A hatch cover does not fall through the hole it is designed to cover. Indeed, the primary purpose of the hatch cover is to prevent tools, materials, or people from falling through openings or holes in the decks of the vessel. Here, the hatch cover itself created the danger it was intended to eliminate, a danger of which the Corps was aware. Cascade as an entity, having manufactured

Page 56 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

and installed the cover, also was aware of its design. In addition, some of Cascade's employees had knowledge of the danger the hatch cover presented and, thus, developed a method to remove the panels that worked around the danger. In fact, Cascade managed to work around this danger for seventeen years. As the evidence at trial established, over the history of this device, the cover fell through the hole only twice. The first incident of the cover falling through the opening occurred when an ESSAYONS's crew member very familiar with the device attempted to lift one of the panels of the hatch cover only slightly.

That prior to Tucker's injury the hatch cover did not injure a worker does not excuse the United States from its responsibility for the consequences of maintaining this dangerous condition. The evidence established the hatch cover consisted of heavy steel material that rested on a narrow lip, and if displaced even slightly could fall to the deck below. There were no hinges or retention cables or any other safeguard on the panels. There was exactly one method to open the hatch cover, and it had to be performed precisely or, in Cinkosky's words, it would be "a disaster." The hatch cover presented an unreasonable danger that was known to the United States but of which not all experienced stevedores who worked for Cascade were aware.

44.     Furthermore, there were no warnings, no training, and no practices and procedures in place to prevent such an accident. Rather, there was simply an expectation by the United States that because Cascade fabricated and installed the hatch cover as directed, the government would, for all time, be held harmless to the hundreds of Cascade workers, and the employees of Cascade's subcontractors, for any subsequent damage caused by this unreasonably dangerous piece of equipment. The court simply does not agree.

45.    Based upon the substantial evidence presented at trial and the law governing Tucker's

claims in this case, the United States is 50% responsible for the harm to Tucker and, accordingly,

obligated to pay that share of his resulting damages.

V.    Conclusion

46.    Within 10 days, Tucker shall submit to the court an appropriate form of JUDGMENT in

this matter.

IT IS SO ORDERED

DATED this ___ day of November, 2014

_____
JOHN V. ACOSTA
United States Magistrate Judge

Page 58 - FINDINGS OF FACT AND CONCLUSIONS OF LAW